# PENNSYLVANIA RAILROAD COMPANY *v.* INTERNATIONAL COAL MINING COMPANY.

## ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 14. Argued February 27, 28, 1912. Reargued November 4, 1912.— Decided June 9, 1913.

Under the Act to Regulate Commerce while reasonableness of rates and permissible discriminations based upon differences in conditions are administrative matters for the Commission, the courts have jurisdiction to determine whether differentials in rates can be allowed for the same commodity under similar conditions of traffic, on account of differences in the disposition of the commodity.

A carrier can only charge the published rate for the same article and when collected cannot pay back any part thereof under any pretense, however equitable, to any shipper or to every shipper; and so *held* that carriers could not after the passage of the Hepburn Act continue to give rebates to shippers pursuant to arrangements made prior to the act on merchandise which the shippers had contracted to sell before that time.

A published tariff, so long as it is in force, has the effect of a statute and is binding alike on carrier and shipper.

While departure from a published tariff is forbidden by the Act to Regulate Commerce and by §§ 7 and 8 thereof the carrier is liable to the person injured for the damages sustained, such damages must be proved and are not to be merely measured by the difference between the published rate paid by the complaining shipper and the lower rate given to a more favored shipper.

While they may be looked at to explain doubtful expressions in a statute, not even formal reports, much less the language of a member of the committee, can be resorted to for the purpose of construing a statute contrary to its plain terms.

While the Act to Regulate Commerce is in many respects highly penal there is no fixed measure of damages in favor of a shipper compelled to pay the published tariff rate while his favored competitors are given a lesser rate by means of rebates. Neither the American nor English decisions are authority for such a rule as to the measure of damages.

The Act to Regulate Commerce imposes on the carrier heavy penalties

for its violations payable to Government and independent of the amount of rebates paid, and is thus a terror to evil doers; but for private wrongs by which private injury is inflicted the compensation recoverable by the injured shipper is measured by the damages actually sustained and proved.

173 Fed. Rep. 1, reversed.

THE International Coal Mining Company shipped in interstate commerce 190,655 tons of coal over the Pennsylvania Railroad between April 1, 1894, and April 1, 1901. In 1904 it sued the carrier for $37,268, being the difference between the rates paid by the plaintiff and lower rates resulting from rebates allowed other coal dealers making like shipments over the same road from the same point to the same destination.

Prior to 1899 the carrier collected its open or published rates from all persons shipping coal from the Clearfield District in Pennsylvania. It, however, made a practice of paying rebates, and the plaintiff admits on the face of its complaint that it received rebates of from 10 to 25 cents per ton. It alleges, however, that other consignors received from 15 to 45 cents per ton, and the claim made is "for the further rebate due by the defendant to the plaintiff in excess of the rebates heretofore paid by the defendant to the plaintiff on account of said shipments."

During the trial these claims for additional rebates on shipments prior to 1889 were eliminated by the court.

The question then left in the case involved plaintiff's right to recover on account of rebates having been allowed other companies after April 1, 1899, on what was called "contract coal." The plaintiff had no contracts which overlapped April 1, 1899, and claimed to have learned after January, 1904, of the allowances being made. It thereupon brought this suit for the rebate or difference between the low rate allowed shippers of contract coal and the lawful rate paid by plaintiff on 41,000 tons.

There was a second count in the complaint, alleging

that the plaintiff charged excessive freight for the transportation of plaintiff's coal, in that it charged sums varying from 15 cents per ton to 45 cents per ton in excess of a reasonable charge, and said defendant "is liable to pay said sum of $37,268.85 with interest thereon from the time of the said overpayments, and this suit is brought to recover the said sums of money."

The plaintiff proved the number of tons in each shipment made by it between April, 1899, and April, 1901, and that it paid the full tariff rate thereon. It also proved that interstate shipments had been made by other coal companies on the same dates from and to the same points and that such companies on their "contract coal" had been paid rebates of 5, 10, 15, 25 or 35 cents per ton, depending upon the difference between the rates when shipment was made and those in force on the dates of the various contracts of sale. It did not appear how many tons had been shipped by any of these companies, nor on how many tons they had been paid 5 cents per ton, or on how many 35 cents per ton, or the intermediate figures. There was evidence that the Berwind-White Company received no rebates on 90 per cent of its shipments, being free coal, but that it did receive rebates on the remaining 10 per cent. which was contract coal.

In addition to evidence as to the payment of such rebates, there was testimony that the Railroad Co. had also made lateral and terminal allowances to some shippers without at the same time making lateral or terminal allowances to the plaintiff. It was claimed that these allowances were unjust discriminations and amounted to the payment of rebates, inasmuch as there was no such dissimilarity in condition between shipments by such companies and those made by the plaintiff as would justify the payment to them without making a similar payment to the plaintiff.

The defendant admitted the difference in treatment, but

claimed that it was justified by the difference in condition. The railroad did not allow the plaintiff for services in hauling loaded and empty cars between the railroad and its nearby mine, but claimed that it paid the Altoona Company 18 cents per ton for services in hauling loaded and empty cars between the mine and the railroad station. The carrier offered evidence to show that the Altoona mine was 4 or 5 miles from the main line, which was reached by a spur track or road having very heavy grades, sharp curves, and three switchbacks over which it was impracticable for the Pennsylvania engines to be safely operated. There was evidence that the amount paid the Altoona Company for such hauling of cars was reasonable.

It was admitted also that the carrier paid the Berwind-White Company, another shipper from the Clearfield District, a terminal charge for furnishing at the New York pier the labor, power and machinery to unload and dump the cars. There was evidence that this was the customary charge allowed for such services in New York harbor.

There was no distinct ruling as to these allowances, but the court evidently treated these payments, not as undue preferences or rebates, but as compensation for transportation services rendered by the shipper in hauling cars to and from the mine and for service on the pier in New York. He refused to charge that the jury could treat these initial and terminal allowances as rebates or as unjust discriminations, or that they could be considered in measuring the damages to which plaintiff might be entitled.

The items prior to April 1, 1899, and these items for initial and terminal allowances having been eliminated, the case was submitted to the jury to determine the amount plaintiff was entitled to recover in consequence of the admitted payment of rebates on "contract coal," no such payments being made to the plaintiff on its shipments of

"free coal." There was some evidence as to the commercial value of being able to ship contract coal at the original freight rate and an estimate of the profits which would have been derived had the same rebates been allowed plaintiff. What, if any, verdict could have been based on this theory was not submitted to the jury, the court charging that where rebates had been allowed other companies, the plaintiff "would be entitled to recover from the Railroad the difference of the returns."

On May 23, 1908, the jury found for the plaintiff a verdict of $12,013.51. Both parties moved for a new trial and both excepted to the court's refusal to set aside the verdict. ·162 Fed. Rep. 996. The Circuit Court of Appeals affirmed the judgment. 173 Fed. Rep. 1. The International Coal Company accepted the decision. But the Pennsylvania Railroad Company brought the case here by writ of error, in which, among many other assignments of error, it complains of the court's refusal to charge that "to entitle the plaintiff to recover, the jury must be satisfied that it sustained some loss or injury due to the fact that the defendant was carrying, at the same time, at lower rates, coal shipped by other shippers."

Mr. Francis I. Gowen, with whom Mr. Frederic D. McKenney was on the brief, for plaintiff in error:

In the light of the principles established in Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, and Balt. & Ohio R. R. Co. v. Pitcairn Coal Co., 215 U. S. 481, and of the application made of those principles to the facts in Robinson v. Baltimore & Ohio R. R. Co., 222 U. S. 506, the Circuit Court was not possessed of the requisite jurisdiction to consider and determine the underlying and basic issue involved in the present case.

A court is not the proper tribunal to set aside or annul the tariff rates of a carrier. This power belongs exclusively

to the Interstate Commerce Commission, and it necessarily follows that courts cannot indirectly relieve shippers from the controlling effect of such rates by permitting recoveries either of any portion thereof or, what is equivalent thereto, of damages because of their exaction, until at least the shipper has been relieved from the binding force of such rates by action of the Commission. A tariff rate is binding upon shipper as well as upon carrier. The obligation to observe the same is absolute and is, in effect, statutory in character.

The plaintiff in error in the present case, therefore, was bound to charge and collect, and the defendant in error was bound to pay the rates which were actually charged and paid. Both parties, then, being so bound, an action cannot be maintained by one to recover from the other damages claimed to have been sustained because of the payment demanded and made, when this payment represented a charge which the one party was legally obliged to make and the other one legally obliged to pay. See § 6 of the Interstate Commerce Act.

The Interstate Commerce Commission in many instances has condemned as unlawful, because unreasonable or discriminatory, rates which have been exacted from shippers, while at the same time denying reparation to them. *Anaconda Copper Co.* v. *C. & E. R. R. Co.*, 19 I. C. C. Rep. 592, and *International Salt Co.* v. *Penna. R. R. Co.*, 20 I. C. C. Rep. 539.

If the Interstate Commerce Commission has been empowered to determine whether charges or rates of a carrier are unduly discriminatory or unduly preferential, a like power cannot be exercised by the courts. As a matter of law such power is possessed by the Interstate Commerce Commission. *Int. Com. Comm.* v. *Del., Lack. & West. R. R. Co.*, 220 U. S. 235.

The payment by a carrier to one shipper of an unlawful rebate does not give to another shipper a right of action

under the Interstate Commerce Act to recover like rebates on his shipments.

Under § 8 of Commerce Act which confers, and defines the character of, the right of action which can be asserted by shippers because of violations by carriers of any provisions of the act, that right is limited to the "person or persons injured," and the recovery to the "damages sustained." *Parsons* v. *Chi. & N. W. Ry. Co.*, 167 U. S. 447.

If a carrier unlawfully refunds to a shipper any part of the tariff rate, it thereby violates the Interstate Commerce Act, but such unlawful act cannot be made the basis of an action at the instance of another shipper, the purpose of which is to compel it to repeat its original violation of the act, in order that such shipper may secure also the benefit of a concession in rates which by the terms of the act the carrier is prohibited from making, and he from receiving. The same is true of cases under the discrimination act of Pennsylvania. See *Hoover* v. *Penna. R. R. Co.*, 156 Pa. St. 220.

The "amount of injury suffered" is the measure of the single damages to be allowed. But it does not at all follow that the amount of injury suffered is the difference in the rates charged. It might be or it might not be, but in any event it must be a subject of proof, and there was no proof in the case of the actual damage sustained. *Un. Pac. R. R. Co.* v. *Goodridge*, 149 U. S. 680, distinguished, as that case turned on the statute of Colorado which contained special provisions to the effect that if the carrier made concessions or rebates to shippers it must extend them to all shipping under the same circumstances and conditions.

No damages are recoverable from a carrier which has violated the provisions of the act by charging unequal rates unless the shipper seeking the damages can establish that actual injury resulted to him from such violation. *Anaconda Copper Co.* v. *C. & E. R. R. Co.; Int. Salt Co.* v. *Penna. R. R. Co.*, supra.

If the right of action asserted in the present case is maintainable, it does not extend to all shipments made by the defendant in error in the period in which the unlawful rebates were paid on contract coal, without regard to the consideration that these rebates were not paid on all shipments of the shippers shipping contract coal, but only on the portion thereof which represented contract coal.

This question has not been dealt with or determined by any court in this country. It was considered by the English courts in *Denaby Colliery Co.* v. *Manchester &c. Ry. Co.*, L. R. 11 App. Cas. 97, and while some of the court were of the opinion that the amount of the overcharges paid by the Colliery Company was to be ascertained with reference to the volume of shipments which had been carried at the lower rate, the application of such a rule will not work out equitable results, nor tend to secure an equality of charge.

A like service, within the meaning of § 2 of the Interstate Commerce Act, is not rendered by a carrier in the transportation from the same district to a common point of shipments which move over a through joint line made up of its own line and that of another carrier, and shipments which move only over the carrier's own line. *Railway Co.* v. *Osborne*, 52 Fed. Rep. 912; *Tozer* v. *United States*, 52 Fed. Rep. 917; *Parsons* v. *Chicago &c. Ry.*, 63 Fed. Rep. 903; *Detroit Ry. Co.* v. *Int. Com. Comm.*, 74 Fed. Rep. 803; *Loup Colliery Co.* v. *Virginia Ry.*, 12 I. C. C. Rep. 471; *Cedar Rapids Ry.* v. *Chicago &c. Ry.*, 13 I. C. C. Rep. 250, 255; Drinker on Int. Comm. Act, § 124; Judson on Int. Comm., § 245.

To the same effect are: Beale & Wyman, Railroad Rate Regulation, § 943; Nelson on Int. Com. Comm., p. 70; Barnes on Int. Transp., § 428, paragraph D. See also *Griffee* v. *Railroad*, 2 I. C. C. Rep. 301; *Missouri Ass'n* v. *M., K. & T. Ry.*, 12 I. C. C. Rep. 483.

A like rule was followed by the English courts, in *Taylor* v. *Metropolitan Ry. Co.* (1906), L. R. 2 K. B. Div. 55.

A Federal court is not bound to give effect to a judicial sale made by a state court. It is at liberty to ignore the sale if, in its judgment, the state statutes under which the state court proceeded to decree and make the sale did not authorize a sale of the particular property or effect sold.

*Mr. William A. Glasgow, Jr.*, with whom *Mr. James W. M. Newlin* was on the brief, for defendant in error:

The action was brought in the Circuit Court of the United States to recover sums illegally collected by the defendant carrier from the plaintiff shipper, which sums were declared to be illegal by § 2 of the Act to Regulate Commerce.

The defendant violated that section by charging and collecting from the plaintiff a greater compensation for the transportation of coal than it charged and collected from other persons "for doing for . . . them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions." Action was brought in the Circuit Court of the United States under § 9 of the act, to recover the damages provided by § 8 for the charging of the sums "declared to be unlawful" by § 2 of the act. The plaintiff did not complain to the Interstate Commerce Commission.

The jury rendered a verdict for an amount equal to the excess charges collected from the plaintiff over and above the charges contemporaneously to other persons for like service. Judgment was entered by the Circuit Court upon the verdict. The Circuit Court of Appeals affirmed the judgment, and the case is now here for review.

The plaintiff had the right to proceed with its action in the Circuit Court without complaining to the Interstate Commerce Commission in the first instance.

A complaint to the Interstate Commerce Commission in the first instance is only required under the Act to Regulate Commerce where "there is involved a question of administrative discretion." *L. & N. R. R. Co.* v. *Cook Brewing Co.*, 223 U. S. 70.

When it is shown, as in this case, that § 2 of the act has been violated by the carrier, then there is no "question of administrative discretion" involved, as there was in the *Abilene Cotton Oil Company Case*, 204 U. S. 426, for § 2 of the act itself declares the carrier "guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

Section 2 defines "unjust discrimination," and unlike § 3, relieves the Interstate Commerce Commission from the duty of determining in the exercise of its discretion whether certain acts therein set forth amount to "unjust discrimination," by declaring that unequal charges under similar circumstances is, as a matter of law, "unjust discrimination."

Under § 2, every shipper is entitled "under similar circumstances and conditions" to equality of charges for like service.

When the carrier violated the act by charging plaintiff "greater compensation" for like contemporaneous service than it charged others, then the plaintiff was deprived of its statutory right to equality of charges, by the "unlawful" act of defendant, and by § 8 plaintiff was entitled to recover "the full amount of damages sustained."

The measure of plaintiff's damages was such an amount as would put plaintiff upon the basis of equality of charges assured to it by § 2. See *I. C. C.* v. *B. & O. R. Co.*, 145 U. S. 263, at page 270, quoting with approval, Mr. Jus-

tice Blackburn, in *Great Western Ry. Co.* v. *Sutton*, L. R. 4 H. L. 226, 239, as follows: "When it is sought to show that the charge is extortionate, as being contrary to the statutory obligation to charge equally, it is immaterial whether the charge is reasonable or not; it is enough to show that the company carried for some other person or class of persons at a lower charge during the period throughout which the party complaining was charged more under the like circumstances."

In the case of *Great Western Ry. Co.* v. *Sutton, supra,* at p. 238, Mr. Justice Blackburn also said: "And I think it follows from this that if the defendants do charge more to one person than they during the same time charged to others, the charge is by virtue of the statute extortionate."

In enacting § 2 of the Interstate Commerce Act, which was substantially taken from § 90 of the English Railway Clauses Consolidation Act of 1845, Congress intended to incorporate into the statute the construction given to said section by the English courts. *I. C. C.* v. *B. & O. R. R. Co.,* 145 U. S. 263, at page 284; *I. C. C.* v. *D., L. & W. R. R. Co.,* 220 U. S. 235, at page 253.

If the excess charge to the plaintiff by the carrier was extortionate, and deprived it of its statutory right, it is submitted that at least the plaintiff is entitled to recover the amount unlawfully extorted from it.

MR. JUSTICE LAMAR, after making the foregoing statement, delivered the opinion of the court.

The International Coal Company operated a mine in the Clearfield District and, with its competitors, shipped between 1890 and 1902 large quantities of coal in interstate commerce. In 1904 it sued the Pennsylvania Railroad Company, basing its action, in part, on the fact that prior to April 1, 1899, the Railroad Company had paid other

shippers rebates of from 15 to 45 cents per ton, while paying plaintiff a rebate of only 10 to 25 cents per ton. Its claim for a sum equal to the difference between the rebate paid to it and that given other shippers was eliminated by the trial judge on the ground that "courts do not sit to measure the difference in degree in violation of the law in favor of one party or the other. The question of the money value that each of them received in their violation of the law will not be looked into, . . . not for the purpose of relieving the defendant, but because the plaintiff is just as culpable . . . and as much a violator of the law as the defendant."

In view of this ruling, the case, as finally submitted to the jury, involved plaintiff's right to recover on account of shipments made after April 1, 1899. On that date the carrier increased the rates and discontinued the payment of rebates, except that for the purpose of saving shippers against loss, it made a difference between what is called "free coal" and "contract coal." Under this practice, where coal had been sold for future delivery, the carrier collected the published tariff rate, but rebated the difference between it and the lower rate in force when the contract of sale had been made. When after April 1, 1899, the plaintiff applied for allowances, its demand was rejected, with the statement that all its contract coal would be protected in the same manner as others in the Clearfield District. The International Coal Company had no overlapping or unfulfilled contracts and claiming that it did not learn of the practice to protect such contracts until, in 1904, it brought this suit. It proved that between April 1, 1899, and April 1, 1901, it had shipped about 40,000 tons on which it had paid the full tariff rate, while other companies shipping from and to the same places at the same time had been allowed on their contract coal rebates of 5, 10, 15, 25 or 35 cents per ton. Plaintiff recovered a verdict.

1. In the court below the Railroad made no question of jurisdiction. But on the argument here it insisted that the case should be remanded with instructions to dismiss the complaint upon the ground that courts had no power to adjudicate the administrative question as to whether a carrier could make a difference in rate between shipments of free and contract coal. It argued that this was a rate-making question and that it was for the Commission, as the rate-regulating body, to determine not only whether a dissimilarity existed, but whether the rates were properly adjusted to meet that dissimilarity.

Under the statute there are many acts of the carrier which are lawful or unlawful according as they are reasonable or unreasonable, just or unjust. The determination of such issues involves a comparison of rate with service, and calls for an exercise of the discretion of the administrative and rate-regulating body. For the reasonableness of rates, and the permissible discrimination based upon difference in conditions are not matters of law. So far as the determination depends upon facts, no jurisdiction to pass upon the administrative questions involved has been conferred upon the courts. That power has been vested in a single body so as to secure uniformity and to prevent the varying and sometimes conflicting results that would flow from the different views of the same facts that might be taken by different tribunals.

None of these considerations, however, operates to defeat the courts' jurisdiction in the present case. For even if a difference in rates could be made between free and contract coal, none was made in the only way in which it could have been lawfully done. The published tariffs made no distinction between contract coal and free coal, but named one rate for all alike. That being true, only that single rate could be charged. When collected, it was unlawful, under any pretense or for any cause, however equitable or liberal, to pay a part back to one shipper or to

every shipper.  The statute required the carrier to abide absolutely by the tariff.  It did not permit the Company to decide that it had charged too much and then make a corresponding rebate; nor could it claim that it had charged too little and insist upon a larger sum being paid by the shipper.  (February 4, 1887, 24 Stat. 379, c. 104, § 2; March 2, 1889, 25 Stat. 855, c. 382, § 6.  *Armour Co.* v. *United States,* 209 U. S. 56, 83.)  The tariff, so long as it was of force, was, in this respect, to be treated as though it had been a statute, binding as such upon Railroad and shipper alike.  If, as a fact, the rates were unreasonable the shipper was nevertheless bound to pay and the carrier to retain what had been paid, leaving, however, to the former the right to apply to the Commission for reparation.

In view of this imperative obligation to charge, collect and retain the sum named in the tariff, there was no call for the exercise of the rate-regulating discretion of the administrative body to decide whether the carrier could make a difference in rates between free and contract coal. For whether it could do so or not, the refund of any part of the tariff rate collected was unlawful.  It could not have been legalized by any proof, nor could the Commission by any order have made it valid.  The rebate being unlawful it was a matter where the court, without administrative ruling or reparation order, could apply the fixed law to the established fact that the carrier had charged all shippers the published or tariff rate and refunded a part to a particular class.  This departure from the published tariff was forbidden, and § 8 (24 Stat. 382) expressly provided that any carrier doing any act prohibited by the statute should be "liable to the person injured thereby for the full amount of damages sustained in consequence of any such violation, together with reasonable attorneys' fees."

2. But although this suit was brought to enforce a cause of action given by this section to any person injured, it is a noticeable fact that in its pleading the plain-

tiff does not claim to have been damaged and there is neither allegation nor proof that it suffered any injury. It contends, however, that this was not necessary for the reason that, as matter of law, it was entitled to recover as damages the same rate per ton on all plaintiff's shipments as had been rebated any other person, on any of his tonnage, shipped at the same time over the same route. And such a right of action was expressly given in § 2 of the original Bill to Regulate Commerce, which, as it passed the Senate May 12, 1886, did provide that the carrier "shall be liable to all persons who have been charged a higher rate than was charged any other person or persons for the difference between such higher rate and the lowest rate charged upon like shipments during the same period; or if such lower rate was made on any time contract or understanding, the said common carrier shall be liable to pay a like rebate or drawback to all other shippers over the same route between the same points who have shipped goods during the time that such contract or understanding was in operation."

The fact that this provision measuring the amount of recovery by rebate was omitted from the Act, as finally reported to both Houses and passed, is not only significant, but so conclusive against the contention of the plaintiff that it quotes—not the report of the conference committee—but a statement,[1] made by a member of

---

[1] Mr. Cullom. Before action on my motion, I desire to make a statement of the changes in the bill. The following is a statement of the changes in the bill as passed by the Senate which have been agreed to and are recommended by the committee of conference:

   *      *      *      *      *      *      *      *

"Sections 2, 3, and 4 of the Senate bill, prohibiting discriminations, contained provisions in relation to the recovery of damages. These have been stricken out of said sections, and have been grouped together in one section, which is made section 8 of the committee bill. Except as to this rearrangement, substantially the only change made has been the addition of the provision of the House bill that 'a reason-

the Senate Conference Committee, to support the present argument that § 8 means the same thing as the omitted clause. But while they may be looked at to explain doubtful expressions, not even formal reports—much less the language of a member of a Committee—can be resorted to for the purpose of construing a statute contrary to its plain terms, or to make identical that which is radically different. *United States* v. *Freight Association*, 166 U. S. 290, 318; *Maxwell* v. *Dow*, 176 U. S. 581, 601. Section 2 of the original Senate Bill said nothing about *damages* but in case of rebating gave a shipper a right, in the nature of an action, for a penalty to be measured by the difference between the lawful and the unlawful rate, whether damage resulted or not. That provision was stricken out and § 8 of the Act, as passed by both Houses of Congress and approved by the President, gave a right of action for *damages* and attorneys' fees to "the person injured"—and, of course, to the extent of the injury.

3. There were many provisions in the statute for

---

able counsel or attorney's fee' shall be allowed by the court in every case of the recovery of damages. The parts of said sections which are stricken out in consequence of the rearrangement referred to are all of section 2 after the word 'unlawful,' in line 13, all of section 3 after the word 'business,' in line 18, and lines 23 to 27, both inclusive, in section 4. No other change is made in section 2." 49 Cong. Rec. 2d Sess., vol. 18, Part 1, p. 170.

.Section 7 of the House Bill (H. R. 5667) provided that if any carrier should do an act forbidden or omitted to do an act required, or should violate the statute, such carrier should be "held to pay to the person or persons injured the full amount of damages so sustained . . . with reasonable counsel or attorney's fees. . . ." This bill was before the Conference Committee, and the House members, as required by the rules of the House, made a written statement of the action of the Conference, in which it was said (vol. 18, Part II, Cong. Rec., 49th Cong., 2d Sess., pp. 695, 698, 774) that "the eighth section of the substitute bill"—being the eighth section of the present act—"contains the substance of the seventh section of the House Bill in regard to damages and counsel fees but expressed in somewhat different language."

imprisonment and fines. On the civil side the Act provided for compensation—not punishment. Though the Act has been held to be in many respects highly penal, yet there was no fixed measure of damage in favor of the plaintiff. But, as said in *Parsons* v. *Chicago & N. W. Railway*, 167 U. S. 447, 460, construing this section (8) "before any party can recover under the act he must show not merely the wrong of the carrier, but that that wrong has in fact operated to his injury." Congress had not then and has not since given any indication of an intent that persons not injured might, nevertheless, recover what though called damages would really be a penalty, in addition to the penalty payable to the Government. On the contrary, and in answer to the argument that damages might be a cover for rebates, the act of June 18, 1910 (36 Stat. 539, c. 309), provided that where a carrier misquotes a rate it should pay a penalty of $250, not to the shipper, but to the Government, recoverable by a civil action brought by the United States. 35 Stat. 166. Congressional Record (1910), 7569. The danger that payment of damages for violations of the law might be used as a means of paying rebates under the name of damages is also pointed out by the Commission in 12 I. C. C. 418–421, 423; 14 I. C. C. 82.

4. It is said, however, that it is impossible to prove the damages occasioned one shipper by the payment of rebates to another; and that if the plaintiff is not entitled to recover as damages the same drawback that was paid to its competitor, the statute not only gives no remedy but deprives the plaintiff of a right it had at common law to recover this difference between the lawful and the unlawful rate.

We are cited to no authority which shows that there was any such ancient measure of damages, and no case has been found in which damages were awarded for such discrimination. Indeed, it is exceedingly doubtful whether there was at common law any right of action for any sort

of damages in a case like this, while this statute does give
a clear, definite and positive right to recover for unjust
discrimination.   It thereby either first created the right
or removed the doubt as to whether such suit could be
brought.   The English courts had held that a shipper, who
paid a reasonable rate, had no cause of action because the
carrier had charged a lower rate to another.   *Great Western
R. R.* v. *Sutton,* L. R. 4 H. L. 226, 238.   The American
decisions were conflicting, though "the weight of author-
ity in this country was in favor of an equality of charge to
all persons for similar services."  *I. C. C.* v. *B. & O.,* 145
U. S. 263, 275.   But even in those American courts, which
held that the rates must not only be reasonable but equal,
the doctrine had not been so far developed as to settle
what was the measure of damages.   *Hays* v. *Pennsylvania
Co.,* 12 Fed. Rep. 309, decided at Circuit, is favorable to
plaintiff's contention.   But *Union Pacific Ry.* v. *Goodridge,*
149 U. S. 680; *Louisville E. & St. L. R. R.* v. *Wilson,* 132
Indiana, 517; *Messenger* v. *R. R.,* 8 Vroom, 37 N. J. L.
531; *Cook* v. *Chicago &c. Ry.,* 81 Iowa, 551; *Great Western
Ry.* v. *Sutton,* L. R. 4 H. L. 226; *London &c. Ry.* v. *Ever-
shed,* 3 App. Cas. 1029; *Denaby* v. *Manchester &c. Ry.,* 11
App. Cas. 97, relied on by plaintiff, do not support the
proposition that damages can be recovered without proof
of what pecuniary loss had been suffered as a result of the
discrimination.

In one of these cases the suit was brought by a shipper
to recover damages because the railroad refused to carry
out a contract to discriminate in his favor.   In others the
court treated the low rate as evidence of what was a
reasonable rate and thereupon gave judgment for damages
as for an overcharge.   *Union Pacific R. R.* v. *Goodridge,*
149 U. S. 680, 709, involved the construction of the
Colorado statute, which did not, as does the Commerce
Act, compel the carrier to adhere to published rates, but
required the railroad to make the same concessions and

drawbacks to all persons alike, and for a failure to do so made the carrier liable for three times the actual damage sustained or overcharges paid by the party aggrieved. This distinction is also to be noted in the English cases cited. The Act of Parliament did not require the carrier to maintain its published tariff but made the lowest rate the lawful rate. Anything in excess of such lowest rate was extortion and might be recovered in an action at law as for an overcharge. *Denaby* v. *Manchester Ry.*, L. R. 11 App. Cases, 97, 116. But the English courts make a clear distinction between overcharge and damages, and the same is true under the Commerce Act. For if the plaintiff here had been required to pay more than the tariff rate it could have recovered the excess, not as damages but as overcharge, and while one count of the complaint asserted a claim of this nature, the proof did not justify a verdict thereon, for the plaintiff admitted that it had only paid the lawful rates named in the tariff. Of course, no part of such payment of lawful rates can be treated as an overcharge or as an extortion.

Having paid only the lawful rate plaintiff was not overcharged, though the favored shipper was illegally undercharged. For that violation of law, the carrier was subject to the payment of a fine to the Government and, in addition, was liable for all damages it thereby occasioned, the plaintiff or any other shipper. But under § 8, it was only liable for damages. Making an illegal undercharge to one shipper did not license the carrier to make a similar undercharge to other shippers, and if having paid a rebate of 25 cents a ton to one customer, the carrier in order to. escape this suit had made a similar undercharge or rebate to the plaintiff, it would have been criminally liable, even though it may have been done in order to equalize the two companies. For, under the statute, it was not liable to the plaintiff for the amount of the rebate paid on contract coal, but only for the damages such illegal payment

caused the plaintiff.  The measure of damages was the pecuniary loss inflicted on the plaintiff as the result of the rebate paid.  Those damages might be the same as the rebate, or less than the rebate, or many times greater than the rebate; but unless they were proved they could not be recovered.  Whatever they were they could be recovered, because § 8 expressly declares that wherever the carrier did an act prohibited or failed to do any act required, it should be "*liable to the person injured thereby for the full amount of damages sustained in consequence of such violation, . . . together with reasonable attorney's fee.*"  In view of this language it becomes necessary to inquire what the evidence shows was the injury inflicted or the damage sustained by the plaintiff in 1901 in consequence of paying rebates in 1901 on contract coal sold in 1899.

5.  On various dates between April 1, 1899, and April 1, 1901, the International Company made shipments of coal from the Clearfield District to points in New Jersey, Massachusetts, and New York, its heaviest shipments being to South Amboy, New York Harbor.  The aggregate was 40,000 tons, on which the lawful rate was paid.  During the same period four other companies shipped to the same points, receiving rebates of from 5 to 35 cents per ton, but the amount of tonnage on which such rebates were paid does not appear.  There was no proof of injury—no proof of decrease in business, loss of profits, expense incurred or damage of any sort suffered—the plaintiff claiming that, as matter of law, the damages should be assessed to it on the basis of giving to it the same rate, on all its tonnage, that had been allowed on any contract coal shipped, on the same dates, whether such tonnage was great or small.

Considering the multitude of instances in which discrimination has been practiced by carriers, in ancient and modern times, it is remarkable how little is to be found in decisions or text books which treat of the elements and measure of damages in such cases.  In the absence of any

settled rule on the subject, the new question must be determined on general principles.

. The statute gives a right of action for *damages* to the injured party, and by the use of these legal terms clearly indicated that the damages recoverable were those known to the law and intended as compensation for the injury sustained. It is elementary that in a suit at law both the fact and the amount of the damage must be proved. And although the plaintiff insists that in all cases like this the fact and amount of the pecuniary loss is matter of law, yet this contention is not sustained by the language of the act, nor is it well founded in actual experience, as will appear by considering several usual and every-day instances suggested by testimony in this record. For example:—

If plaintiff and one of the favored companies had both shipped coal to the same market on the same day, the rebate on contract coal may have given an advantage which may have prevented the plaintiff from selling, may have directly caused it expense, or may have diminished or totally destroyed its profits. The plaintiff, under the present statute, in any such case being then entitled to recover the full damages sustained;—

But the plaintiff may have sold at the usual profit all or a part of its 40,000 tons at the regular market price, the purchaser, on his own account, paying freight to the point of delivery. In that event not the shipper but the purchaser, who paid the freight, would have been the person injured, if any damage resulted from giving rebates. To say that seller and buyer, shipper and consignee, could both recover would mean that damages had been awarded to two where only one had suffered;—

Or, to take another example—a favored dealer may have shipped 10,000 tons of coal to the open New York market, receiving thereon a rebate of 35 cents a ton, or $3,500. The plaintiff at the same time may have shipped 20,000 tons and sold the same at the regular market price.

Under the rule contended for it would then be entitled to 35 cents a ton on 20,000 tons, or $7,000 as damages. Such a verdict, instead of compensating it for losses sustained, would have given to the plaintiff a profit on the carrier's crime in paying a rebate of $3,500 and would have made it an advantage to it instead of an injury for the carrier to violate the law.

In order to avoid this anomalous, yet logical, result it is now suggested that, as in the overcharge cases (*Denaby* v. *Manchester Ry.*, L. R. 11 App. Cases, 97), the plaintiff should only recover a rebate on 10,000 tons, or on the same weight upon which the carrier had allowed a drawback to the competitor. But, while less drastic, this is still an arbitrary measure and ignores the fact that the same anomalous result would follow if there had been, say, ten dealers, each shipping 10,000 tons on the same day. For each of the ten would have been as much entitled as plaintiff to recover $3,500 on their several shipments of 10,000 tons, and the ten verdicts would aggregate $35,000, because of the payment of $3,500 to the favored shipper.

It is said, however, that while there may be no presumption that a shipper was injured because the carrier paid a rebate on a single shipment, or on an occasional shipment, yet it could recover if rebates had been so habitually given as to establish a practice of discrimination. Proof that rebates were customarily paid, would come nearer showing that injury was suffered but would still fall short of proving the extent of the damage, and is not the theory on which the plaintiff proceeds. For it argues that whenever it showed that a lower rate had been charged on contract coal sold in 1899 it was entitled to recover the same. rate on shipments made by it to the same place on the same day in 1901, even though there had been no competition in the two sales and without proof that there had been any fall in market prices, diminution in its profits, decrease in its business, or increase in its expenses. It

claimed that it was a mere matter of mathematics and that for every rebate on contract coal, plaintiff was entitled to a like reduction on every ton of its coal without further proof of damage or injury.

6. To adopt such a rule and arbitrarily measure damages by rebates would create a legalized, but endless, chain of departures from the tariff; would extend the effect of the original crime, would destroy the equality and certainty of rates, and, contrary to the statute, would make the carrier liable for damages beyond those inflicted and to persons not injured. The limitation of liability to the persons damaged and to an amount equal to the injury suffered is not out of consideration for the carrier who has violated the statute. On the contrary, the act imposes heavy penalties, independent of the amount of rebate paid, and as each shipment constitutes a separate offense, the law in its measure of fine and punishment is a terror to evil doers. But for the public wrong and for the interference with the equal current of commerce these penalties or fines were made payable to the Government. If by the same act a private injury was inflicted a private right of action was given. But the public wrong did not necessarily cause private damage, and when it did, the pecuniary loss varied with the character of the property, the circumstances of the shipment and the state of the market, so that instead of giving the shipper the right to recover a penalty fixed in amount or measure, the statute made the guilty carrier liable for the full amount of damages sustained,—whatever they might be and whether greater or less than the rate of rebate paid.

7. This conclusion, that the right to recover is limited to the pecuniary loss suffered and proved, is demanded by the language of the statute, the construction put upon it years ago in the *Parsons Case*, and is the view taken in the only other case we find in which this question, under the Act to Regulate Commerce, has been construed. In

*Knudsen* v. *Michigan Central R. R.*, 148 Fed. Rep. 968, 974, it was said by the Circuit Court of Appeals for the Eighth Circuit that to "support a recovery under this section there must be a showing of some specific pecuniary injury. A cause of action does not necessarily arise from those acts or omissions of a common carrier that may subject it to a criminal prosecution by the Government or to corrective or coercive proceedings at the instance of the Commission." A similar principle was applied in *Meeker* v. *Lehigh Valley R. R.*, 183 Fed. Rep. 548, 550, and in *Central Coal Co.* v. *Hartman*, 111 Fed. Rep. 96, where the suit was to recover damages caused by a violation of the Anti-trust Act.

Another case, on facts quite like those here involved, is that of *Hoover* v. *Pennsylvania R. R.*, 156 Pa. St. 220, where the statute, like the Commerce Act, gave the party injured a right of action for damages suffered. In violation of the state law the railroad allowed a manufacturing company a rebate of 20 cents a ton on coal shipped. In a suit for the recovery of damages the trial court charged the jury that the difference between the high and low rate was the measure of recovery. This was reversed, the court saying (p. 244): "The amount of injury suffered is the measure of the single damages to be allowed. But it does not at all follow that the amount of injury suffered is the difference in the rates charged. It might be, or it might not be, but, in any event, it must be a subject of proof. . . . It does not appear that the plaintiffs sold their coal for any less than the current market price, . . . except when they and the other dealers were engaged in a war of prices and sold it far below the actual cost, in a struggle to capture the market."

In view of the express provisions of § 8 of the Act to Regulate Commerce, it was error to refuse to charge that "to entitle the plaintiff to recover, the jury must be satisfied that it sustained some loss or injury due to the fact

that the defendant was carrying at the same time at lower rates coal shipped by other shippers." The judgment of the Circuit Court of Appeals is reversed and the case remanded to the District Court, with directions to grant a new trial.

*Reversed.*

MR. JUSTICE PITNEY, dissenting.

The judgment under review sustains a recovery in behalf of a Company shipping coal in interstate commerce, that was charged and paid the lawful published rates of freight, for the difference between the rates thus charged and paid and the less rates customarily allowed to other shippers of coal during the same period and between the same termini. 173 Fed. Rep. 1. The action is based upon §§ 2 and 8 of the Interstate Commerce Act.[1] (24 Stat.

---

[1] SEC. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons, a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

SEC. 8. That in case any common carrier subject to the provisions of this act shall do, cause to be done, or permit to be done any act, matter, or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

379, Chap. 104.)   The discrimination was accomplished by means of rebates allowed to the other shippers, the excuse for which, or the reason for the discrimination as assigned by the plaintiff in error, was that the coal on which the rebates were allowed was shipped pursuant to contracts of sale made by the favored shippers prior to the putting in force of the published tariff, and made in reliance upon the lower rates then in force.   It was proved that during the two years from April 1, 1899, to April 1, 1901, the plaintiff shipped about 40,000 tons, upon which it paid the full tariff rate.   The verdict and judgment for $12,013.51 represent the difference between the freight charges actually paid by the plaintiff and what it would have paid if its coal had been carried on the same terms as the "contract coal."

I agree with the view of the court that the suit was maintainable without any previous action by the Interstate Commerce Commission.   I agree also that "even if a difference in rates could be made between free and contract coal, none was made in the only way in which it could have been lawfully done.   The published tariffs made no distinction between contract coal and free coal, but named one rate for all alike.   That being true, only that single rate could be charged."

Were the question before us, I should be inclined to say that the Interstate Commerce Act does not admit of a difference in rate for substantially the same transportation service, at the same time and under substantially similar circumstances, based upon the mere fact that the coal of one shipper has been previously sold, under "contract" or otherwise, while the coal of the other shipper has been sold but at a different time, or remains to be sold on its arrival at market.   Such a discrimination is in effect based upon the mere ownership of the goods transported, which has recently been condemned by this court. *Interstate Com. Com. v. Del., Lack. & Western R. R.,* 220

U. S. 235, 252. And see *New Haven R. R.* v. *Interstate Com. Com.,* 200 U. S. 361, 395; *Armour Packing Co.* v. *United States,* 209 U. S. 56, 82.

The court, while sustaining the right of action upon the facts presented in this record, reverses the judgment and awards a new trial, on the ground that under the statute there is no presumption of loss on the part of the shipper against whom the discrimination is made, and therefore no established measure of damages in favor of the plaintiff; that § 8 of the Act, in giving a right of action for damages to the injured party, indicated the legislative intent that the responsibility of the carrier to a shipper injured by discrimination in rates should be measured not by the amount of the discrimination, but by the consequential injury accruing to the shipper because of the discrimination, and that without special proof of resulting damage there can be no recovery.

With great respect, I feel constrained to dissent from the view thus taken of the Act of Congress, and from the result to which it leads in this case.

I have not been able to bring myself to accept that view, and, on the contrary, consider that § 2 of the act deals with the prohibited discrimination in rates as a direct pecuniary injury to the disfavored shipper, precisely equivalent in amount to the discrimination; that the Act looks upon the common carrier as a public servant, bound to treat all shippers alike; that it recognizes that the established and published rates, while reasonable in law may be unreasonable in fact, and are proven to be so when the carrier customarily charges less to favored shippers; that it treats the customary allowance to favored shippers of rebates or drawbacks as an admission by the carrier that the higher rate charged to the disfavored shipper is excessive and extortionate in fact by precisely the amount of the rebate; that the disfavored shipper is the "person injured," within the meaning of § 8, and

that the "damages sustained in consequence of any such violation" are, in cases of rate discrimination, at least as great as the amount of the discrimination; that the maintaining of equality in rates being the duty of the public servant as prescribed by the Act, the question whether the shipper, on paying such rates as the law prescribes, charges the freight to his consignees, directly, or indirectly, or not at all, is a matter of no legitimate concern to the public servant. I am convinced further, as the result of a somewhat exhaustive examination of the question, that the view just indicated is not only consistent with the language and evident policy of the Act, viewed in the light of the evils that it was designed to correct, but is consistent with its legislative history, and at the same time accords with the practical construction that has been placed upon it by the Interstate Commerce Commission, and recognized by the courts (including this court) from the time of its enactment; that no other practicable mode of determining the damages, capable of general application, has been suggested for cases of rate discrimination than that which measures the recovery by the amount of the discrimination; and that this was the well-settled measure of damages in such cases, as administered generally in the courts of this country prior to the passage of the Act, and at the same time was the established rule of damages under the Act of Parliament upon which our § 2 was modeled, as already established by repeated decisions of the House of Lords when Congress passed the "Act to Regulate Commerce"; and that the English decisions are cogent evidence of the intent and meaning of Congress, as this court has several times declared.

The precise error attributed to the trial judge is the refusal to charge, as requested, that "To entitle the plaintiff to recover, the jury must be satisfied that it sustained some loss or injury due to the fact that the defendant was

carrying at the same time, at lower rates, coal shipped by other shippers."

Since the recovery was based upon a discrimination arising from the payment of rebates to the other shippers on coal shipped by them in fulfillment of contracts made long before, so that the coal upon which the rebates were allowed did not and could not come into direct competition with the plaintiff's coal in the market, it is presumable that there was no consequential injury to the plaintiff attributable to this particular series of rebates, nor any provable injury aside from the fact that more money was exacted from plaintiff than ought to have been exacted on principles of equality. A reversal of the judgment upon the ground adopted by the court is equivalent to a denial of the right of action in this case, and apparently in all cases except in the rare instance where merchandise on which rebates are allowed happens to come into direct market competition with the goods of the complaining shipper.

Not only in the present case, but in most cases, it is impossible to trace actual consequential damages to the particular discrimination, and so the view adopted virtually nullifies the right of action given by § 8 of the Act, so far as concerns persons injured by the discriminations that are prohibited by § 2.

Section 8 says in terms that for anything done by the common carrier, contrary to the prohibition of the Act, it shall be "liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation." Each of the preceding seven sections contains prohibitions, from the violation of which damage may result to the shipper; especially the first four, of which § 1 prohibits unjust and unreasonable charges; § 2 prohibits discriminations in charges, by whatever device accomplished; § 3 prohibits "any undue and unreasonable preference or advantage to any particular

person, etc., in any respect whatsoever;" and requires that reasonably proper and equal facilities be afforded for the interchange of traffic with connecting lines; and § 4 prohibits the charging of greater compensation under substantially similar circumstances and conditions for a shorter than for a longer distance over the same line in the same direction, the shorter being included within the longer distance; with a proviso not now pertinent. Certainly, the Act contemplated that shippers against whom these discriminations were practiced, and for whose benefit the entire Act was framed, were to be treated as "persons injured" within the meaning of § 8. And by that section they are to have the "full amount of damages sustained in consequence of any such violation."

The word "damages," according to its customary usage, is at least as properly applicable to the immediate and direct result of imposing higher charges upon one shipper than are customarily charged under similar circumstances and for a like service to other shippers, as it is to the ultimate consequences of such discrimination. The purpose that runs throughout the Act is to require equality of treatment. How can this be so easily accomplished as to treat the damage as being complete when the freight bill is paid, based upon rates that are higher than those charged to other shippers, and to require equality by insisting upon a return of the excess?

Courts everywhere are insistent that remote and consequential and speculative damages shall be excluded from consideration, and that only those directly and proximately resulting from the injury shall be considered. What can be more direct and proximate as damage to a shipper against whom a discrimination is practiced, than the measure of the discrimination as shown by a comparison of freight bills? And what can be more remote and speculative than to enter into considerations arising out of the mode in which the shipper transacts his business,

and to consider whether the particular commodities upon which the discriminatory rates have been imposed were sold under this or that arrangement as between shipper and consignee, and whether the discriminations have resulted in the loss of a particular sale, or of a particular profit, or of a particular customer? Congress, of course, recognized the notorious fact that rate discriminations often rendered it impossible for the disfavored shippers to profitably continue in business. Rate discriminations were prohibited for that reason, amongst others. But Congress, I submit, never intended to impose upon the injured party the impossible task of tracing his ultimate losses to this or to that shipment.

But it is said that whatever view might otherwise be entertained, a particular (and, as I think, a very strained) meaning must be attributed to the word "damages" as used in the Interstate Commerce Act, because of the course of proceedings in Congress that resulted in the enactment of that statute. It is pointed out that § 2 of the original bill provided in terms that in the case of a rate discrimination, the carrier should be liable to the disfavored shipper "for the difference between such higher rate and the lowest rate charged upon like shipments during the same period," with a similar provision respecting rebates and drawbacks, and it is said that because this provision was finally omitted from the Act, the result is not only significant but conclusive evidence of a legislative intent that the "damages" in § 8, so far as discriminatory rates are concerned, are to be measured in some other manner. If § 8 had in terms prescribed any other measure than that which was in the original § 2, or if any other had been then known to the law, I could appreciate the force of the argument. The course of the debate in Congress, as quoted in the opinion, shows that Senator Cullom, who was the chief sponsor for the bill, and a member of the Senate Conference Committee, explained the change as

intended to simply group into one section all the provisions respecting damages that had been contained in three sections.   That this was done merely for the purpose of simplification, and with the understanding that the courts would of course apply the proper measure of damages in each case, and would not need Congress to tell them how to do this, clearly appears from Senator Cullom's remarks in explanation of the change.   If any other measure of damages in rate discrimination cases had ever been successfully applied, I could concede some force to the reasoning that is based upon this change in the bill during its progress through Congress.   But no other measure has been applied, nor does the opinion point out how any other can be.

As a great English judge said,[1] in one of the cases referred to below: "I think that there would be very great difficulty, if the principle of overcharge [meaning a comparison of the rates charged] were rejected, in finding any other remedy by way of damages applicable to such a case."   These words were used in the House of Lords in the last of a series of notable cases that finally settled the measure of damages for rate discriminations, under an Act of Parliament that furnished the model for § 2 of our Interstate Commerce Act.   That decision was rendered a little more than a year before the passage of our Act.   It was undoubtedly known to Senator Cullom (a lawyer by profession), who doubtless also knew that the English courts, in a series of decisions, had adopted the simple solution that the damage was to be measured by the amount of the discrimination.   It would, I think, have surprised the learned and distinguished Senator if he had been told that in merely "simplifying" his act he had in effect deprived the disfavored shipper of any and

[1] The Earl of Selborne, formerly Lord Chancellor Selborne, and before that, as Sir Roundell Palmer, counsel for Great Britain at the Geneva Arbitration.

all remedies in the ordinary case of discrimination, and that too, in a legislative measure whose underlying purpose was to prevent such discriminations, and to add to and extend the remedies already available for securing redress against them.

Prior to the passage of the Act, while the courts of England perhaps did not recognize a right to recover for unjust discriminations unless the rate charged to the complaining party was of itself excessive, the weight of authority in this country was to the contrary, as pointed out by this court in *Interstate Commerce Commission* v. *B. & O. Railroad*, 145 U. S. 263, 275. And see *Hays* v. *Pennsylvania Co.* (1882), 12 Fed. Rep. 309, and note; *Samuels* v. *Louisville & N. R. Co.* (1887), 31 Fed. Rep. 57; *Cook* v. *Chicago &c. Ry. Co.*, 81 Iowa, 551, 563; *Louisville E. & St. R. R. Co.* v. *Wilson*, 132 Indiana, 517, 525. The Interstate Commerce Act and the reports and debates in Congress that preceded it are replete with evidence that the Act was intended to give to the shipper against whom discrimination was practiced at least as ample remedy as he would have against exactions that were for any other reason unjust or extortionate.

As a matter of practical construction, the course adopted by the Interstate Commerce Commission in reparation cases is most convincing, not only of what was deemed to be the intent of Congress, but of the fact that no other measure of reparation is practicable saving that which is based on the rate differential. In every case that has arisen, so far as I can discover, the difference in rate has been adopted as the basis of reparation. The cases will be referred to below.

Reference is made in the opinion to the declaration of this court (by Mr. Justice Brewer) in *Parsons* v. *Chicago & Northwestern Ry.*, 167 U. S. 447, 460, that "before any party can recover under the Act he must show not merely the wrong of the carrier, but that that wrong has in fact

operated to his injury." But the next succeeding words show that this had no such meaning as is now attributed to it. They are: "*If he* [the plaintiff] *had shipped to New York and been charged local rates he might have recovered any excess thereon over through rates.*"

In short, Parsons had made only "local" shipments (Iowa to Chicago), and had paid the regular published rates therefor. The court held that he was *not injured*, under the particular circumstances of the case, by the failure of the Railway Company to file and publish a certain tariff of *through* rates, applicable not to Chicago shipments, but only to those destined to New York and other points on the Atlantic seaboard. And so the decision was, that he had *no ground of action.* The case has no proper bearing, as an authority, upon the question of the *measure of damages;* but if it is to be employed as an authority at all upon that question, the declaration of the court, that if Parsons had been entitled to recover, his damages would have been measured by the rate differential, ought not to be overlooked.

The fact is that in the *Parsons Case,* while the plaintiff claimed that the carrier was guilty of a discrimination in rates, this court upon an analysis of his petition—upon a demurrer to which the case was determined—found there was no infraction of § 2, because the plaintiff had made no shipments that entitled him to the lower rates of which he complained; so that there was no real basis for his action except the failure of the carrier to publish or file the rates as required by § 6 of the Act. The gist of the complaint was that the carrier, which operated a system of railroad from points in Nebraska through Iowa to Chicago, for the purpose of giving unlawful preference to the shippers of corn and oats in Nebraska, and to unlawfully discriminate against the plaintiffs and other Iowa shippers, put in force from Nebraska points a certain freight tariff on corn and oats in car load lots to Rochelle, Illinois, *when*

*destined to New York, Boston, Philadelphia, or Baltimore;* that this was never circulated or published at any of the stations on defendant's road in Iowa, nor filed with the Interstate Commerce Commission, and its existence was concealed from the knowledge of plaintiff and other shippers on the line of defendant's road in Iowa; that on certain dates named, plaintiff had for shipment at a station in Iowa, certain quantities of corn and oats, and was prevented and deprived, by reason of the matters alleged, of the right to ship the same upon the terms and at the rate thus given to shippers in the State of Nebraska, and was obliged to and did ship his grain over defendant's road from the Iowa point *to Chicago,* at a higher rate than he could have had by taking advantage of the Nebraska schedule if that had been published in Iowa; that this constituted an unlawful preference and discrimination by defendant in favor of the shippers of grain in the State of Nebraska and against the plaintiff as a shipper of grain in the State of Iowa, and the defendant thereby charged, demanded and received a greater compensation for a shorter, than for a longer haul (the longer including the shorter), under substantially similar circumstances. This court (by Mr. Justice Brewer) in dealing with the case, pointed out (p. 455) that the tariff complained of was a joint tariff, and not a tariff of local rates on grain to Rochelle, Illinois, or even to Chicago, which was the eastern limit of the defendant's road; that (p. 457) the pleader had not made out a case on which it could be said that the so-called joint tariff was a mere device under color of which defendant was shipping grain from Nebraska points to Chicago at less rates than were being charged to the nearer points in Iowa; and proceeded to show (p. 459), that plaintiff's argument practically was "that if the tariff had been filed with the Commission, it might have made an order, either general or special, requiring that it be posted at the Iowa stations; that if it had been so posted

he might have examined the rates and might have determined to ship his corn, not to Chicago, but to one of the four eastern points named in such tariff." It was this line of reasoning that led the court to the point of remarking, p. 460, that "The only right of recovery given by the Interstate Commerce Act to the individual is to the '*person or persons injured thereby* for full amount of damages sustained in consequence of any of the violations of the provisions of this act.' So, before any party can recover under the Act he must show, not merely the wrong of the carrier, *but that that wrong has in fact operated to his injury. If he had shipped to New York and been charged local rates he might have recovered any excess thereon over through rates.* He did not ship to New York, and yet seeks to recover the extra sum he might have been charged if he had shipped. Penalties are not recoverable on mere possibilities."

The words italicised (not so in the original) serve, I think, to show that the court was merely negativing a recovery on the part of one who might have shipped, but did not ship, and was *not negativing, but on the contrary affirming, arguendo, the theory that in the event of the existence of a right of action the measure of damages would have been the difference in rates.*

The opinion herein refers to and undertakes to distinguish the three English cases to which I have already referred—*Great Western Ry. Co.* v. *Sutton* (1869), L. R. 4 H. L. 226; *London &c. Ry.* v. *Evershed* (1878), L. R. 3 App. Cas. 1029; and *Denaby Main Colliery Co.* v. *Manchester &c. Ry. Co.* (1885), L. R. 11 App. Cas. 97—and states that they "do not support the proposition that damages can be recovered without proof of what pecuniary loss had been suffered as a result of the discrimination;" that "the court treated the low rate as evidence of what was a reasonable rate, and thereupon gave judgment for damages as for an overcharge;" and that "the Act of

Parliament . . . made the lowest rate the lawful rate." With great respect, it seems to me the court has misapprehended the effect of these decisions; perhaps because of not distinguishing two variant statutes there under discussion. There was no Act of Parliament that "made the lowest rate the lawful rate," or in terms declared that any excess over the lowest rate was extortionate, or recoverable in an action at law, as for an overcharge. The remedy that the courts of England accorded to the aggrieved shippers against whom the railway companies had discriminated, was based upon an Act of Parliament that, so far as concerns the measure of damages for an unlawful discrimination, is not to be distinguished from § 2 of the Interstate Commerce Act; indeed, it furnished the model for that section. True, it was a very imperfect model in some respects, and was improved upon by Congress; but it was not departed from in any respect that pertains to the *measure of damages* for favoritism in rate-making. Whatever distinction (if any) the English courts make between "overcharge" and "damages" has arisen with respect to a different statute, and one that furnished the model for § 3 of our Interstate Commerce Act.

Since the English decisions referred to were rendered prior to the adoption of our Act, and afforded a construction of the English acts from which ours was taken, it is of the utmost importance that the terms of the respective Acts of Parliament and the precise grounds of the decisions should be clearly understood.

The first of those acts is the so-called Equality Clause, being § 90 of the Railways Clauses Consolidation Act, 1845, (8 and 9 Vict. c. 20), enacted to consolidate in one act, certain provisions usually inserted in the "special acts" under which railway companies were incorporated. Section 90 is set forth in full in the margin.[1] As will

---

[1] 90. And whereas it is expedient that the company should be enabled to vary the tolls upon the railway so as to accommodate them to the

be observed, while requiring equality in tolls and rates, so far as it applied, this clause was quite limited with respect to the circumstances under which it applied, being especially confined in its operation by the phrase "passing only over the same portion of the line of railway under the same circumstances." It was in this respect, especially, that Congress improved upon the model. But, so far as this section did apply, the English courts held, in the cases cited in the opinion, and for reasons that will be set forth fully below, that where inequality in rates was shown, the shipper against whom the discrimination was made could recover from the railway company the amount of the discrimination in an action for money had and received, as so much money unlawfully exacted from him, just as by the common law he could recover the excess over a reasonable charge. In the cases cited, or in any others to which my attention has been called, no other measure of damages has been sanctioned, excepting that based upon the amount of the discrimination.

The other act, under which some controversy had arisen in the English courts about the *allowance* of damages

---

circumstances of the traffic, but that such power of varying should not be used for the purpose of prejudicing or favoring particular parties, or for the purpose of collusively and unfairly creating a monopoly, either in the hands of the company or of particular parties; it shall be lawful, therefore, for the company, subject to the provisions and limitations herein and in the special act contained, from time to time to alter or vary the tolls by the special act authorized to be taken, either upon the whole or upon any particular portion of the railway as they shall think fit; provided that all such tolls be at all times charged equally to all persons, and after the same rate, whether per ton per mile or otherwise, in respect of all passengers, and of all companies or carriages of the same description, and if conveyed or propelled by a like carriage or engine, passing only over the same portion of the line of railway under the same circumstances, and no reduction or advance in any such tolls shall be made, either directly or indirectly, in favor of or against any particular company or person traveling upon or using the railway.

(but none at all about the *measure* of them), is—"The Railway and Canal Traffic Act, 1854," (17 and 18 Vict. c. 31), of which the second, third and sixth sections are pertinent to the present inquiry. The second prescribes the duty of railway companies to furnish reasonable facilities for traffic, without giving "any undue or unreasonable preference or advantage to or in favour of any particular person or company, or any particular description of traffic, in any respect whatsoever, nor shall any such company subject any particular person or company, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." The third section gives to parties complaining of anything done or omitted to be done, in violation of contravention of the Act, a special and extraordinary remedy, by applying "in a summary way, by motion or summons," to certain of the superior courts, or to any judge of such court, authorizing the court or judge to hear and determine the matter complained of, and to issue an injunction or interdict, restraining the company from further continuing such violation of the Act, and to punish disobedience by attachment or other process; also authorizing the court or judge to impose upon the company a heavy daily fine for disobedience of the injunction or interdict; and "Such moneys shall be payable as the court or judge may direct, . . . either to the party complaining, or into court to abide the ultimate decision of the court, or to Her Majesty, and payment thereof may, without prejudice to any other mode of recovering the same, be enforced by attachment or order in the nature of a writ of execution," etc. By the sixth section it was enacted as follows: "6. No proceeding shall be taken for any violation or contravention of the above enactments except in the manner herein provided, but nothing herein contained shall take away or diminish any rights, remedies, or privileges of any person or com-

pany against any railway or canal or railway and canal company under the existing law."

The courts of England have held that because § 2 of this act establishes rights beyond those existing at the common law, and § 3 gives an extraordinary remedy therefor, and § 6 excludes other remedies, there can be no recovery in an ordinary action for damages based upon the mere infringement of the provisions of § 2; but it has been queried whether for a violation of § 2, if such violation involves an unlawful extortion of money for carriage, the ordinary remedies at law for extortion may not be applicable. This question was reserved by the House of Lords in the *Denaby Colliery Case*, 11 App. Cas. 97, 112. But the Court of Appeal having in that case declared (L. R. 14 Q. B. Div. 225) that the remedy by § 6 was exclusive, the same court three years after the enactment of our Interstate Commerce Act (*Rhymney Ry. Co. v. Rhymney Iron Co.*, 25 Q. B. Div. 146, 150), adhered to that view. And see, on the same subject, *Lancashire & Yorkshire Ry. Co. v. Greenwood* (1888), L. R. 21 Q. B. Div. 215.

So far as I have observed, the English courts have never wavered upon the question of allowing the difference in freight charges to be recovered by the disfavored shipper, for violations of the Equality Clause of the act of 1845; nor ever sanctioned the view that there could be any other measure of damages. Nor can I find that any other measure of damages has been suggested for a violation of the act of 1854 in respect of a rate discrimination. The controversy about that act has been whether any suit could be maintained at all for a violation of it.

*But, as this court has repeatedly pointed out, the provisions of the second section of the Interstate Commerce Act respecting equality of rates are modeled after the Equality Clause (§ 90) of the English act of 1845; while the third section of our Act is modeled after the English act of 1854.*

In *Interstate Commerce Commission* v. *Balt. & Ohio R.*

R., 145 U. S. 263, 277, etc., the court referred to the English acts, and some decisions of the English courts thereunder, saying (p. 284): "These traffic acts do not appear to be as comprehensive as our own, and may justify contracts which with us would be obnoxious to the long and short haul clause of the act, or would be open to the charge of unjust discrimination. *But so far as relates to the question of 'undue preference,' it may be presumed that Congress, in adopting the language of the English act, had in mind the construction given to these words by the English courts, and intended to incorporate them into the statute.* McDonald v. Hovey, 110 U. S. 619."

In *Texas & Pacific Ry.* v. *Interstate Commerce Commission,* 162 U. S. 197, 222, the court (by Mr. Justice Shiras) said: "Similar legislation by the Parliament of England might render it profitable to examine some of the decisions of the courts of that country construing its provisions. In fact, the second section of our act was modeled upon section 90 of the English 'Railway Clauses Consolidation Act' of 1845, known as the 'Equality Clause,' and the third section of our act was modeled upon the second section of the English 'act for the better regulation of the traffic on railways and canals' of July 10, 1854, and the 11th section of the act of July 21, 1873, entitled—'An act to make better provisions for the carrying into effect the Railway and Canal Traffic Act, 1854, and for other purposes connected therewith.'"

In *Interstate Commerce Commission* v. *Del., Lack. & Western R. Co.,* 220 U. S. 235, 253, the court (by Mr. Chief Justice White) said: "*It is not open to question that the provisions of § 2 of the Act to Regulate Commerce were substantially taken from § 90 of the English Railway Clauses Consolidation Act of 1845, known as the Equality Clause. Texas & Pac. Railway* v. *Interstate Com. Com.,* 162 U. S. 197, 222. Certain also is it that at the time of the passage of the Act to Regulate Commerce that clause in the Eng-

lish act had been construed as only embracing circumstances concerning the carriage of the goods and not the person of the sender, or, in other words, that the clause did not allow carriers by railroad to make a difference in rates because of differences in circumstances arising either before the service of the carrier began or after it was terminated. It was therefore settled in England that the clause forbade the charging of a higher rate for the carriage of goods for an intercepting or forwarding agent than for others. *Great Western Ry. Co.* v. *Sutton* (1869), L. R. 4 H. L. 226; *Evershed* v. *London & N. W. R. Co.* (1878), 3 App. Cas. 1029; and *Denaby Main Colliery Co.* v. *Manchester &c. Ry. Co.* (1885), 11 App. Cas. 97. And it may not be doubted that *the settled meaning which was affixed to the English Equality Clause at the time of the adoption of the Act to Regulate Commerce applies in construing the second section of that act,* certainly to the extent that this interpretation is involved in the matter before us. *Wight* v. *United States,* 167 U. S. 512; *Interstate Commerce Commission* v. *Alabama M. R. Co.,* 168 U. S. 144, 166."

Now, what was the construction of the Equality Clause of the act of 1845, that had been adopted by the English courts, in the cases thus cited by this court as controlling evidence of what Congress intended in enacting the second section of our act?

*The Great Western Ry. Co.* v. *Sutton* (1869), L. R. 4 H. L. 226, was an action brought and judgment recovered for "*the amount of certain alleged overcharges.*" But they were "overcharges" only in the sense that they were the differential between the rates charged to the plaintiff and those charged to others. The opinions of the judges being called for by the Lords, Mr. Justice Blackburn delivered the prevailing view, expounding the subject historically, as follows (p. 237): "At common law a person holding himself out as a common carrier of goods was not under

any obligation to treat all customers equally.[1]  The obligation which the common law imposed upon him was to accept and carry all goods delivered to him for carriage according to his profession (unless he had some reasonable excuse for not doing so) on being paid a *reasonable* compensation for so doing; and if the carrier refused to accept such goods, an action lay against him for so refusing; and if the customer, in order to induce the carrier to perform his duty, paid, under protest, a larger sum than was reasonable, *he might recover back the surplus beyond what the carrier was entitled to receive, in an action for money had and received, as being money extorted from him.*  But the fact that the carrier charged others less, though it was evidence to show that the charge was unreasonable, was no more than evidence tending that way.  There was nothing in the common law to hinder a carrier from carrying for favored individuals at an unreasonably low rate, or even *gratis*.  All that the law required was, that he should not charge any more than was reasonable; see per Byles, J., in *Baxendale* v. *Eastern Counties Ry. Co.*, 4 C. B. (N. S.) 78; and per Willes, J., in *Branley* v. *Southeastern Ry. Co.*, 12 C. B. (N. S.) 74.  But when railways came into operation, and it was found that they practically superseded all other modes of transit, it became a question for the legislature how far they would, when granting numerous persons power to make a railway and act as carriers on that line, impose on them restrictions beyond what the common law imposed on ordinary carriers.  At first the legislature in each special act inserted such clauses as seemed, to the particular committees, reasonable in each case.  Very soon those came to be usual clauses which the then Chairman of Committees of the House of Lords used to require to be inserted in all railway bills with more

---

[1] NOTE: Otherwise in this country.  *Interstate Commerce Commission* v. *B. & O. Railroad*, 145 U. S. 275, and other cases cited *supra*.

or less modification.  They were known by his name as 'Lord *Shaftesbury's* clauses.'  Finally, in 1845, the legislature embodied in a general act (8 and 9 Vict., c. 20) those clauses which it was thought expedient should generally be inserted in railway acts."

Mr. Justice Blackburn, after referring to the special acts that governed the case (what, in this country, would be called the "charter" of the company), by one of which the act of 1845 was incorporated into it, and saying that the rights of the parties must depend upon the effect of certain other sections in conjunction with § 90 of the act of 1845, which was, to leave the company free to charge what it thought fit for parcels not exceeding five hundred pounds in weight, "subject, however, to the effect of the proviso for equality contained in the 90th section of the *Railway Clauses Consolidation Act*, 1845, and the similar proviso for equality contained in the former special act of this company (7 and 8 Vict., c. 3, sec. 50)," then proceeded to say:

"*Then comes the question, what is the legal effect of this proviso for equality?*  I think it appears from the preamble of the 90th section of the *Railways Clauses Consolidation Act*, 1845, that the legislature was of opinion that the changed state of things arising from the general use of railways made it expedient to impose an obligation on railway companies acting as carriers beyond what is imposed on a carrier at common law.  And if this be borne in mind, *I think the construction of the proviso for equality is clear, and is, that the defendants may, subject to the limitations in their special Acts, charge what they think fit, but not more to one person than they, during the same time, charge to others under the same circumstances.*  And I think it follows from this that *if the defendants do charge more to one person than they, during the same time, charge to others, the charge is, by virtue of the statute extortionate.*  And I think that *the rights and remedies of a person made to pay a charge beyond the*

*limit of equality* imposed by the statute on railway companies acting as carriers on their line must be *precisely the same as those of a person made to pay a charge beyond the limit imposed by the Common Law on ordinary carriers as being more than was reasonable. . . . When it is sought to show that the charge is extortionate as being contrary to the statutable obligation to charge equally, it is immaterial whether the charge is reasonable or not; it is enough to show that the company carried for some other person or class of persons at a lower charge during the period throughout which the party complaining was charged more under the like circumstances.*[1]  One single act of charging a person less on one particular occasion would not I think, make the higher charge to all others extortionate during all that day, or week, or month, or whatever the period might be.  I think it would be *necessary to shew that there was a practice of carrying for some person or class of persons at the lower rate.*  But a single instance would be evidence to prove this practice; and if followed up by shewing that the smaller charge was repeatedly made at intervals over a period of time, *the jurors would, in the absence of explanation, be justified in drawing, and would probably draw, the inference that the company during the period carried for others at that lower rate, and consequently that the higher charge was extortionate as being beyond the statutable limit of equality.*"

He then proceeds to show that the weight of authority was very much in favor of this view, citing many previous cases; and wherever the measure of recovery is referred to it is in such terms as these: "The excess might be recovered back under a count for money had and received," (p. 240); "the plaintiff recovered the overcharge under a count for money had and received," (pp. 241, 242).  Referring to *Garton* v. *Bristol and Exeter Railway Co.* (1861), 1 B. & S.

---

[1] Note: This sentence was quoted with approval by this court, in 145 U. S. 277.)

112, a case in which he had sat, he says (pp. 243): "If, as rather appears from the report to be the case, the decision went so far as to say that an action for money had and received would not lie where the overcharge was in breach of the statutable obligation to charge equally, as much as if it had been in breach of the common law obligation to charge reasonably, I think the decision was a mistake; and it was overruled in *Baxendale* v. *The Great Western Ry. Co.*, 16 C. B. (N. S.) 137, by the Court of Exchequer Chamber, which comprised three out of the four judges who took part in deciding *Garton* v. *The Bristol & Exeter Ry. Co.*, in the Queen's Bench."

He then reviews some later cases in which, for the first time, a difference of opinion had arisen, with the final result of concluding that the plaintiff was entitled to recover. Four other judges present concurred. Baron Bramwell (p. 250) alone took a different view; not, however, respecting the measure of damages, but upon the question whether the Equality Clause had been violated.

The House of Lords followed the majority of the judges and affirmed the judgment below, Lord Chelmsford delivering an elaborate opinion, in which, after discussing the evidence upon which the violation of the Equality Clause depended, he proceeded as follows (p. 262): "The last subject to be considered is the form of the action; *whether an action for money had and received will lie to recover back overcharges made upon the carriage of the plaintiff's goods, not absolutely but relatively to the charges made to other persons.* It was argued for the defendants that the charge upon the plaintiff's packed parcels, being warranted by the 10 and 11 Vict., ch. 226, and being reasonable, and within the absolute discretion of the company, the plaintiff was not injured by other persons being charged less than he was. But this is a fallacious way of viewing the question. The plaintiff's complaint is not that others are charged less than himself, but that *the fact*

*of their having been charged less entitled him to claim the same rate of charge, and that all beyond that rate is overcharge.* The very fact of the smaller charge to others is the ground of his complaint of an overcharge to himself. Now, if the defendants were bound to charge the plaintiff for the carriage of his goods a less sum, and they refused to carry them except upon payment of a greater sum, as he was compelled to pay the amount demanded, and could not otherwise have his goods carried, *the case falls within the principle of several decided cases, in which it has been held that money which a party had been wrongfully compelled to pay under circumstances in which he was unable to resist the imposition, may be recovered back in an action for money had and received.* In the language of the Court of Common Pleas, in the case of *Parker* v. *The Great Western Railway Company,* 7 Man. & G. 253—'The payments made by the plaintiff were not voluntary, but were made in order to induce the company to do that which they were bound to do without them.'" Lord Chelmsford proceeds then to cite other decisions, showing that the *Garton Case* was erroneously decided, and was overruled by the *Baxendale Case.*

*London & North Western Ry. Co.* v. *Evershed* (1878), L. R. 3 App. Cas. 1029; 5 Eng. Rul. Cas. 351; *was an action by a shipper to recover from the carrier an amount equivalent to the rebates given to another shipper in violation of the Equality Clause.* The House of Lords sustained the action, the Lord Chancellor (Ld. Cairns) saying (p. 1035): "The one right, to my mind, the clear and undoubted right, of a public trader is to see that he is receiving from a railway company equal treatment with other traders of the same kind doing the same business and supplying the same traffic. In my opinion that is not the case with regard to this plaintiff, and therefore I think he is entitled to recover the moneys he had paid under protest." Lord Hatherly said (p. 1035): "My Lords, I have come to

the same conclusion. I have been unable to see, since the beginning of the argument, in a case where there was this difference in the charge against the respondent, how it could possibly be said that the case comes within *the well-established construction of the provisions of the 90th section of the Railways Clauses Consolidation Act.* . . . (p. 1037). Therefore, I apprehend that your Lordships cannot possibly say that the appellants are entitled to make this distinctive charge and give to other traders a rebate without giving the respondent *a return of the money which he has so paid in excess of the charge to other people.* I think the money he has so paid, and paid under protest, can now be recovered back by him." It should be noted that the "protest" was of course not treated as a condition precedent to the recovery. The word was used merely to point out what payments were referred to; there having been, in fact, a protest in respect to the payments in question.

*Denaby Main Colliery Co.* v. *Manchester, Sheffield & Lincolnshire Railway Co.* (H. L. 1885), L. R. 11 App. Cas. 97, was an appeal from a decision of the Court of Appeal, reported in L. R. 14 Q. B. Div. 209; and the case came there from the Queen's Bench Division (Matthew and Day, JJ.), whose decision is reported L. R. 13 Q. B. Div. 674. The questions discussed in the Divisional Court were (a) whether certain "group rates" constituted a violation of the Equality Clause of the Consolidation Act, 1845, § 90, and, if so, whether the damages for breach of that enactment were *limited* to the amount of overcharges (and what was the measure of such overcharges), or whether *general damages* could *also* be recovered. (b) Whether an action lay for breach of the Railway and Canal Traffic Act, 1854, § 2, in view of the prohibition of § 6 of the same act; and, if so, whether the damages for breach of this act were limited to the amount of overcharges, or whether general damages could also be recovered. The "group rates" comprised the rates from

each of the collieries in a certain district, to a number of towns and places in various parts of England, and the coal going from any one of the collieries comprised in the group to any one of these towns and places must pass defendant's colliery, which was on the same line of railway. The judges held (13 Q. B. Div. 678) that the group rates were a violation of § 90 of the act of 1845, and that the overcharge could be recovered in accordance with *Evershed's Case*. This was on the ground that, in the absence of special circumstances to justify the same charge for carrying a greater distance for one customer than for another, there was a case of inequality within § 90 of the act of 1845. The question whether the damages for breach of that section were limited to the amount of overcharges, or whether general damages could also be recovered, was not answered, because there was in the statement of facts no ground upon which an action for general damages would be maintainable. With respect to the act of 1854, it was held that an action did not lie for anything done in contravention of that act, and that *Evershed's Case* was not an authority for such action, since the point was not presented there and no opinion was expressed upon it.

In the Court of Appeal (14 Q. B. Div. 209), the very special facts of the case are set forth. The court (*per* Lindley, L. J.) affirmed the judgment of the Queen's Bench Division that no action would lie in respect of any breach of the provisions of the Railway and Canal Traffic Act, 1854, § 2. Next, it was held that the "grouped rates" were not a violation of the act of 1845, because the termini were not the same; the reasoning being (p. 223) that the words "passing only over the same portion of the line" meant passing between the same points of departure and arrival, and passing over no other part of the line.

But it was held that the Company had violated the Equality Clause by charging to the defendant greater

rates than those charged to one Bannister; the coal in each case going from defendants' mine to Grimsby. As to this, the court proceeded to say (p. 226): "It remains only to consider what damages, if any, the defendants have sustained by reason of the company's reduction of their tolls, for the coal carried from the defendants' colliery for Bannister and shipped at Grimsby for the American steamers and for points south of Harwich. The defendants in fact sent no coals to Grimsby for such shipment, nor did they ever request the railway company to carry coals for such shipment. If they had, there is no reason to suppose that they would have been charged more than Bannister. . . . The fact, however, remains that at various times the railway company did carry coals to Grimsby for the defendants and Bannister, under the like circumstances, as regards trouble and cost to the company, and as regards coals got from the defendants' collieries over the same portion of the line; and the company did charge Bannister for the coals so carried for him less than they charged the defendants; and if the defendants had shown that they had thereby sustained pecuniary loss, they would have been entitled to recover damages in respect thereof. The Divisional Court has held the defendants entitled to recover overcharges made to the defendants on the principle laid down in Evershed's Case, i. e., the charges made to them in excess of the charges made to Bannister for similar services. But the court does not say on what quantity of coal, or on how much of the defendants' coal carried to Grimsby, this excess is to be calculated, and we are unable to see how the quantity is to be fixed. This difficulty did not arise in Evershed's Case; and the principle of that case seems to us inapplicable to the assessment of damages in this case. It cannot be right to calculate the amount of overcharge on all the coal sent by the defendants to Grimsby without reference to the quan-

tity on which, or the times during which, a less rate was charged to Bannister, and, as already stated, we do not see on what principle to fix the amount of alleged over-charge. Under the peculiar circumstances of this case the defendants have not shewn any grounds which will justify the court in holding the railway company liable to them for any overcharges or damages. There is, therefore, nothing to be ascertained by the arbitrator on this head."

In the House of Lords (11 App. Cas. 97), it was held, that where the railway company carried coal from a group of collieries situate at different points along their line, and charged all the collieries with one uniform set of rates in respect of such carriage, the owners of the colliery nearest to the point of arrival were not entitled to main-tain an action for overcharges merely on the ground that the difference in distance showed that the same rate was a discrimination against the shorter haul. The Lords affirmed the decision of the Court of Appeal to the effect (a) that the railway had not in the above respect infringed the provisions of § 90 of the act of 1845. They affirmed the decision (b) that in this particular case an action would not lie for breach of the act of 1854, because undue or unreasonable preference or prejudice, within the meaning of that act, had not been proven. The question whether under any circumstances an action lies for breach of the act of 1854 was reserved. And (c) upon the question of the coal carried from the appellants' colliery to Grimsby at the same time that less rates were charged on Bannister's coal because of its ultimate destination for shipment on American steamers or for points south of Harwich, the House of Lords affirmed the judgment of the Court of Appeal that the allowances made to Bannister were a violation of the Equality Clause of the act of 1845.

*But upon the now important question of damages the House of Lords (reversing the Court of Appeal) held that the appellants were entitled to recover the overcharges, the amount*

*to be ascertained by finding what quantity of coal carried
under the same circumstances and over the same portion of the
line was charged at the higher rate to the appellants at the time
the lower rate was charged to Bannister.*

There was a difference of opinion among the Law Lords
as to whether the Colliery Company was entitled to re-
cover the amount of the overcharge computed upon the
entire tonnage transported for them, or only upon the
less tonnage that had been carried at the reduced rate for
Bannister during the same period.   The Lord Chancellor
(Halsbury) held to the former view; the Earl of Selborne
and, apparently, Lord Blackburn, to the latter.   In the
end, the view of the Lord Chancellor prevailed.   But
the Lords all agreed that an inequality in the rates charged
to two shippers for the same service was to be treated as
conclusive evidence that the disfavored shipper had been
overcharged; and that the rate differential—described
as "overcharge"—was to be adopted as the measure of
the compensation to be awarded for a violation of the
Equality Clause.

The Lord Chancellor said (p. 112): "The remaining
question, namely, what the appellants are entitled to
recover from the company upon the hypothesis that they
have been overcharged, is one which does not seem to me
to be surrounded by the difficulty that has been assumed
to exist.   The arbitrator, to whom this question must go
back, will be able to *find on what quantities of coal the
appellants were charged, during the periods when the railway
company were carrying for Bannister at a less rate; and if the
principle is laid down by your Lordships that the appellant's
coal ought to have been carried at the same rate, I am unable
to see the difficulty of ascertaining the amount of overcharge.*"

The Earl of Selborne said upon this topic (p. 116): "I
agree with the arbitrator in holding this to be a case of
overcharge, and not a question of damages; and I should
answer his question (upon the authority of *Sutton's Case*

and *Evershed's Case*, and of the opinion of Lord St. Leon-
ards in *Finnie's Case*, 2 Macq. 186), by saying that the
proper measure of the overcharge to the appellants is the
difference between the amount charged to them, and that
charged (after deducting the allowance) to Bannister, for
coals carried over the same part of the railway and under
the same circumstances, during the same periods of time.
Is there, then, any insuperable difficulty arising out of the
fact, that during these periods of time, not only coals
on which these allowances were made, but also other
coals, on which Bannister was charged the same rates
with the appellants, were carried over the same distance,
and under the same circumstances? I do not think so. *It
being known how much coal was actually carried at the reduced
rate for Bannister during these periods; it seems to me to
result, from the principle established in the cases of Sutton
and Evershed, that the appellants ought to have been charged
at the same reduced rate up to, but not beyond, the same total
quantity during the same period of time, and that this is the
true measure of the overcharge, for which the arbitrator ought
to give them credit. . . . I think (with the Court of
Appeal) that there would be very great difficulty, if the prin-
ciple of overcharge were rejected, in finding any other remedy
by way of damages applicable to such a case."*

Lord Blackburn, after quoting what was said in the
Court of Appeal (as quoted above), upon the question of
damages, said (p. 124): "I am not satisfied with the way
in which Lindley, L. J., deals with *Evershed's Case*, and
the mode in which the Divisional Court had applied it.
I think that it cannot be right to calculate the amount
of overcharge on all the coal sent by the defendants from
their colliery to Grimsby for shipment, without reference
to the quantity of coal on which, or the time during which,
the less rate was charged to Bannister for coal carried
from the defendants' colliery. The arbitrator has not
found, and I do not think he was bound to find in the

special case, what part of the coals carried by the railway were carried only over the same part of the railway with those carried for Bannister during the same time, so as to make this charge on these coals extortionate. I think when the case goes back he will have to find this in order to ascertain the amount, if any, which can be recovered back as overcharge."

Lord FitzGerald said simply (11 App. Cas. 125): "My Lords, I have read the two elaborate opinions which have been delivered by my noble and learned friend near me, and my noble and learned friend opposite, and I entirely concur in the order which it is proposed to make, and have nothing to add."

But the Syllabus (11 App. Cas. 98) expresses the view of the Lord Chancellor, and the order for judgment (p. 126) shows that this view prevailed.

The order was—"That the arbitrator must ascertain *what quantity of coal carried under the same circumstances and on the same portion only of the line was charged at the higher rate to the defendants at the time the lower rate was charged to Bannister*, the fact that the coal was shipped on the American steamboats or to the south of Harwich not being a difference in the circumstances; *and so ascertain the amount of the overcharge.*"

The very clear result of these three important decisions of the House of Lords was that the amount of the difference in rates was to be treated as so much money unlawfully exacted from the disfavored shipper, and recovered accordingly.

There is not the least doubt that Congress, in passing the Interstate Commerce Act, had in mind these then recent decisions of the English court of last resort,[*] and intended to adopt the principle those cases had established with respect to the Equality Clause of the English act of 1845, viz., that just as, at the common law, a shipper who had been charged an unreasonable rate could recover back

the excess, so under the statute he could treat lower rates customarily allowed to other shippers for the like service as conclusive evidence that he had been subjected to an overcharge, and recover the difference.

To this extent, at least, I deem the question of the measure of damages for unlawful discrimination, contrary to § 2 of the Interstate Commerce Act, to be covered by the previous decisions of this court, already cited (145 U. S. 283; 162 U. S. 222; 220 U. S. 253), which pointed out that the Equality Clause furnished the model for § 2 of the Interstate Commerce Act, and that it was adopted by Congress with the construction that had been put upon it by these same decisions of the House of Lords. Were the matter *res nova*, I should entertain no doubt of the propriety of adhering to the English rule.

Whether the House of Lords was right in the *Denaby Main Colliery Case* in allowing a recovery by the aggrieved shipper based upon the rate differential as applied to his entire tonnage, or whether it should have been limited to a tonnage not exceeding the tonnage of the favored shipper on which the rebate was allowed, if that was less than the tonnage of the aggrieved shipper, may be a question of some doubt. This court in the present case is not called upon to pass upon it.

For the record before us does not present the question whether the plaintiff's recovery ought to have been measured by the tonnage of the favored shippers upon which the rebates were allowed. The plaintiff in error (defendant in the trial court) did not prefer any request or take any exception that would have based the recovery upon a computation of the favored tonnage. There was no evidence, indeed, of the amount of that tonnage; it being simply made to appear that of all the coal shipped by the Berwind-White Company (one of the favored shippers) during the period of rebating, only 10 per centum was contract coal on which rebates were allowed. How much

the Berwind-White Company shipped did not appear, and so it may properly be presumed that 10 per centum of its shipments would amount to more than the total of the plaintiff's shipments.

Defendant did request the trial court to instruct the jury that if the lower rate accorded to other shippers was not justified, "the amount which the plaintiff is entitled to recover is measured by the difference between the rate per ton which it paid on all its shipments during such period, and the rate per ton which the other shipper paid on his or its whole volume of shipments during such period." This, as the Circuit Court of Appeals correctly held (173 Fed. Rep. 6), in effect requested the court to charge, as fixing the measure of recovery, not the lowest rate charged by the railroad to another shipper, but the general average paid on all shipments made by such shipper. I agree with that court in the view that Congress made no such rule. It is inconsistent with anything in the English cases, or in any case in this country to which attention is called.

The conclusion of this court that the right to recover in such a case as the present "is limited to the pecuniary loss suffered and proved," and that the fact that greater charges are exacted from the plaintiff than from his competitor for the like service is not evidence of such pecuniary loss, is, so far as I have been able to discover, entirely unsupported by authority. The *Parsons Case* (167 U. S. 447, 460) is cited as authority, but in my view is not properly to be so considered, for reasons already fully explained. The "only other case" is *Knudsen-Ferguson Fruit Co.* v. *Michigan Central R. Co.*, 148 Fed. Rep. 968, 974. This was an action to recover a sum claimd to have been unlawfully exacted for the icing of a carload of fruit. At p. 974 the court said, *arguendo:* "To support a recovery under this section [§ 8] there must be a showing of some specific pecuniary injury. . . . He [the

shipper] must show either that there has been some unreasonable or excessive charge imposed, *or some unlawful discrimination practiced against him.*" As this court holds that in the present case an unlawful discrimination was practiced against the shipper, I do not see anything in the *Knudsen Case* to deprive it of its right to recover, or to affect the question of damages. *Central Coal & Coke Co. v. Hartman*, 111 Fed. Rep. 96, and *Meeker v. Lehigh Valley R. Co.*, 183 Fed. Rep. 548, were actions to recover treble damages under the Sherman Anti-trust Act; in the latter case (p. 551) the court was careful to point out that the plaintiff was not seeking redress as a shipper, nor was the defendant sued as a carrier. *Hoover v. Pennsylvania R. Co.*, 156 Pa. St. 220, 224, was an action upon a Pennsylvania statute, not, like the Interstate Commerce Act, giving to the party injured a right of action for "damages sustained," but making the offending carrier "liable to the party injured for damages *treble* the amount of injury suffered." The court cited no authority for its decision that the difference in the freight rates did not furnish a measure for the amount of the single damages. Evidently because of the penal character of the remedy the court shrank from adopting what otherwise would be deemed the normal rule for determining the amount of the injury.

On the other hand, *Cook v. Chicago &c. Ry. Co.*, 81 Iowa, 551, 563, is a distinct authority for the proposition that in a case of discrimination in rates accomplished by means of rebating, the amount of the rebates furnishes the measure of damages; the court saying: "The only finding that can in any fairness be made is that after deducting the rebate the rate was reasonable; and that the exaction from the plaintiffs was unreasonable and the discrimination against them unjust." To the same effect is *Louisville &c. R. Co. v. Wilson*, 132 Indiana, 517, 525, where an instruction that the allowance of more favorable

rates to another shipper entitled the plaintiff to recover the difference, was sustained on appeal.

The present decision ignores the practical construction that has invariably been placed upon the act by the Interstate Commerce Commission.

In *Burgess* v. *Transcontinental Freight Bureau*, 13 I. C. C. 668, 680, the Commission ruled upon the precise question now before us, in dealing with a case of rates held excessive *per se*, but only so held as the result of a comparison between the rates under attack and other rates customarily charged. The complainants claimed reparation by reason of shipments under the old rate. Defendants denied that such reparation should be awarded, even though the Commission were of the opinion that that rate was excessive, and this "for the reason that no damage upon the part of the complainants has been established." It appeared that the market was not affected by the rate, and that the freight had been added to the price paid by the consumer; and it was insisted that the complainants who had paid this freight rate had not been actually injured. The Commission said: "Such is not, in our opinion, the proper meaning of this term [damage]. These complainants were shippers of hardwood lumber to this destination, and they were entitled to a reasonable rate from the defendants for the service of transportation. An unreasonable rate was in fact exacted. They were thereby deprived of a legal right, and the measure of their damage is the difference between the rate to which they were entitled and the rate which they were compelled to pay. If complainants were obliged to follow every transaction to its ultimate result, and to trace out the exact commercial effect of the freight rate paid, it would never be possible to show damages with sufficient accuracy to justify giving them. Certainly these defendants are not entitled to this money which they have taken from the complainants, and they ought not to be heard to say that they should not

be required to refund this amount because the complainants themselves may have obtained some portion of this sum from the consumer of the commodity transported."

It is upon this theory that reparation has been awarded by the Commission from the beginning. After an examination of the reports of their decisions as exhaustive as the time at my disposal would permit, I think it entirely safe to say that in the thousands of reparation cases that have been passed upon, reparation has not been refused under circumstances at all resembling those of the case at bar; and that wherever reparation has been allowed it has been based upon the rate differential, and awarded to the shipper who paid the freight, without regard to whether or not he charged it over against his consignee. The same rule has been adopted in all cases, whether the rates charged to the complainant have been deemed unreasonable *per se* or not; indeed, where they have been thus denounced it has ordinarily been done as the result of comparison between the rate under attack and other rates on similar traffic. Illustrative decisions are cited in the margin.[1]

---

[1] Reparation by reason of published rates held unreasonable because discriminatory, irrespective of whether they were otherwise extortionate.

12 I. C. C. 418, 426; 14 I. C. C. 422, 434; 14 I. C. C. 523; 16 I. C. C. 528; 17 I. C. C. 578; 18 I. C. C. 259; 18 I. C. C. 212, 219; 18 I. C. C. 550; 18 I. C. C. 580.

By reason of published rates held unreasonable because in excess of rate afterwards voluntarily established by the carrier.

12 I. C. C. 13; 12 I. C. C. 141; 14 I. C. C. 118; 14 I. C. C. 577; 16 I. C. C. 190, 192; 16 I. C. C. 293; 16 I. C. C. 450; 20 I. C. C. 104.

By reason of published rates held unreasonable because in excess of rate afterwards established by the Commission.

12 I. C. C. 417; 14 I. C. C. 199, 205; 17 I. C. C. 251, 253; 17 I. C. C. 333; 18 I. C. C. 301.

By reason of rates held unreasonable because resulting from error in routing chargeable to the carrier.

14 I. C. C. 527; 18 I. C. C. 527.

This court, while saying very plainly what the word "damages" in § 8 *does not* mean, reaches its conclusion without determining what the word *does* mean. It is said that the "damages may be the same as the rebate, or less than the rebate, or many times greater than the rebate." It is said that in the case under consideration there was "no proof of injury, no proof of decrease in business, loss of profits, expense incurred, or damage of any sort suffered." It is said that "If plaintiff and one of the favored companies had both shipped coal to the same market on the same day, the rebate on contract coal may have given an advantage which may have prevented the plaintiff from selling, may have directly caused it expense, or may have diminished or totally destroyed its profits. The plaintiff, under the present statute, in any such case being then entitled to recover the full damages sustained.". But as the contract coal of the favored shipper had been sold long before (prior to April 1, 1899, at latest), I am unable to see how it can reasonably be supposed that the rebate could have prevented the plaintiff from selling, or have caused it expense, or have diminished or destroyed its profits upon coal that happened to reach destination on the same day.

What, then, is to be the measure of damages? Whatever it is to be, it is apparent that we must henceforward abandon the simple and direct method of computing the

By reason of published rates held unreasonable *per se.*

14 I. C. C. 525; 14 I. C. C. 577; 16 I. C. C. 469; 20 I. C. C. 12; 20 I. C. C. 104; 22 I. C. C. 283.

By reason of published rates held unreasonable because higher than obtainable by another route.

12 I. C. C. 141.

By reason of published rates held unreasonable because exceeding the sum of the locals.

13 I. C. C. 154; 14 I. C. C. 336; 14 I. C. C. 549; 14 I. C. C. 573; 14 I. C. C. 579; 16 I. C. C. 293; 16 I. C. C. 318; 16 I. C. C. 339; 21 I. C. C. 215.

rate differentials, and therefrom ascertaining the amount of the reparation, and must enter into inquiries respecting the state of the market, and ascertain whether, upon the precise date that the goods of the injured party reached the market, goods of the like character owned by the favored shipper came into direct competition with them. All of this seems to me to be utterly impracticable, and I cannot believe that Congress intended any such result to follow from the language it employed.

It is said that under the rule of the *Denaby Colliery Case* it would follow that if there were, say, five dealers, each shipping 10,000 tons, to one only of whom rebates aggregating $3,500 had been allowed, each of the five would be as much entitled as plaintiff to recover $3,500 on their several shipments of 10,000 tons each, and the five verdicts would aggregate $17,500 because of the payment of $3,500 to the favored shipper. But if § 2 of the Act is to be given any vital force, it must be construed as estopping the carrier from saying that the amount actually charged, less the rebate, is less than ought to be charged on a shipment of 10,000 tons; and if he himself rebates $3,500 to one shipper, the requirement that he rebate the same to each of the four others, does not penalize the carrier. It simply requires him to do service for all at the rate which he himself has fixed in dealing with the favored shipper.

Nor can I see that this would "create a legalized, but endless, chain of departures from the tariff." If § 2 is enforced strictly in accordance with the English rule it will very clearly tend to prevent any departures from the lawfully established tariffs.

It seems to me a strange view of the matter to deny direct reparation *in specie* to the aggrieved shipper, by the payment to him of an amount sufficient to leave the net rate charged to him equal to the lowest rate customarily charged to a competitor; and to base this denial on the theory that reparation will do more harm than good, by

creating an "endless chain of departures from the tariff." Of course, the result would be that if there were five shippers, and rebates were given to one of them unlawfully, and then by legal compulsion the carrier were required to give equivalent rebates to the others, this would constitute five "departures from the tariff" instead of one. But what matters it, provided the five shippers are thereby put upon an equal footing? The prohibition against rebates and other discriminations, and also the requirement of established and published rates, are intended to compel fair and equal treatment by the carrier of all shippers. I can see nothing in the act that makes published rates so sacred that departures from them by the carrier must go unredressed, because to redress the grievance will require a further departure. Equality in the treatment of shippers is the end aimed at by the act; published rates are but a means to that end. We should not so exalt the means as to lose sight of the end and object of the Act.

Besides, if the theory of the opinion is to be adhered to, there will necessarily be as many different rates as there are differences in the circumstances of the disfavored shippers who seek redress because of rebates or other rate discriminations. One aggrieved party may receive damages far beyond the money equivalent of the discrimination; another may receive much less; still another may receive nothing at all. If we were to look to the outcome of these private actions for violation of the equality provision of § 2 of the Act, and treat them as amounting in the end to a determination of the freight rate, the inevitable result (on the theory adopted by the court) would be that one violation by the carrier would result in as many different rates as there were different shippers to be discriminated against.

But, with great respect, I again ask: What, in the present case, is to be the measure of damages? The plaintiff, upon shipments aggregating 40,000 tons of coal in two years,

has been charged about $12,000 more than its competitors have been charged during the same period for the same service. The plaintiff has actually paid the freight bills to the railroad company. Upon the face of the record, the plaintiff's expense account has been actually increased by the amount of $6,000 per annum, as compared with its competitors. Other things being equal, the profits of the plaintiff, upon the production and sale of the 40,000 tons of coal, were $12,000 less than otherwise they would have been. It does not appear that other things were not equal. Yet the decision is, that there is "no proof of injury, . . . expense incurred, or damage of any sort suffered." Is not the payment of a full freight bill, as compared with a reduced freight bill, an "expense incurred"? What other expense could be incurred by a shipper, at- tributable to a discrimination in rates?

The opinion says: "Of course, no part of such payment of lawful rates can be treated as an overcharge or as an extortion. Having paid only the lawful rate, plaintiff was not overcharged, though the favored shipper was il- legally undercharged." This is not only unsupported by authority, but is, I submit, inconsistent with the result reached in the present case. The court decides that the plaintiff is injured, and entitled to maintain an action against the carrier under § 8, because the carrier has col- lected less compensation from a favored shipper for the like service. The rebates were merely the device by which the discount from the published rates was accom- plished. How can such an action lie at all, except that § 2 makes the published and otherwise lawful rates un- lawful and extortionate when less rates are charged to favored shippers, through the device of rebates or other- wise? It seems a mere play upon words to say that "the favored shipper was illegally undercharged." Certainly it is not to *him* that the right of action is given by § 8. In short, the opinion treats the imposition of the "lawful

rates"—that is, the published rates—as unlawful for the purpose of establishing the *injuria*, but insists that they must be treated as lawful when we come to ascertain the *damnum.*

The result is, the legal paradox: *Injuria sine damno.* The plaintiff is wronged, but not harmed; it may sue, but may not recover.

If the rate differential is not a proper element of damages in actions brought in the courts, I suppose it will not be proper for the Commission to adhere to it. Yet the sheer impossibility of adopting any other measure of damages, in the multitude of reparation cases that the Commission has to deal with, is perfectly obvious.

The result, upon the whole, is a virtual denial of private remedy for the most common and harmful of those discriminations that the Interstate Commerce Act was designed to prevent and to redress.