### RECONSTRUCTION FINANCE CORPORATION v. SPOKANE, P. & S. RY. CO.

#### No. 11864.

United States Court of Appeals
Ninth Circuit.

Oct. 18, 1948.

Rehearing Denied Dec. 2, 1948.

Dewey H. Palmer, of Portland, Or., for appellant.

Charles A. Hart, Manley B. Strayer and Hart, Spencer, McCulloch & Rockwood, all of Portland, Or., for appellee.

Before: DENMAN, Chief Judge, and STEPHENS and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

The decisive question left with the District Court after pre-trial and through stipulation of the parties was: Which, if either, of two railway freight rates itemized in the freight tariff schedules filed with the Interstate Commerce Commission was proper to be charged the government (plaintiff) on carloads of alcohol owned and shipped by it from certain points in Louisiana to certain points in the states of Oregon and Washing-

---

[6] St. Joe Paper Co. v. U. S., 5 Cir., 155 F.2d 93.

[7] Ferguson-Hendrix Co. v. Fid. & Dep. Co., 140 Pac. 700.

ton.[1] The court decided, in agreement with the carrier's claim, that "Item No. 1497 (sec. 2) Alcohol N.O.S. in tank cars" bearing the rate of $1.59 per unit of charge was the proper item to be applied. The initials N.O.S. stand for "Not Otherwise Specified" in the schedule. The government contended that Item No. 1563, "Alcohol, in-bond" bearing the rate of $1.23 per unit of charge was the proper item to be applied. The alcohol was actually shipped under bills of lading designating the commodity "Alcohol Tax Free N.O.I.B.N." These initials stand for "Not Otherwise Itemized By Name." There is no specification in the tariff schedule applying to alcohol shipments which are designated "Tax Free," and "N.O.I.B.N." is not applied to alcohol shipments in the tariff schedule. The carrier claims that the shipments should therefore have borne the letters N.O.S. That is, the shipments are not otherwise specified. Carrier further claims that Item 1563, "Alcohol, in-bond," cannot apply because of the fact that the commodity shipped was not in or under bond.

Before going on with the basis of the conflicting claims, it will be helpful to have in mind the fact that the U. S. government excise tax on alcohol per unit of measure is very much greater (at least 10 times greater) than the market value of the alcohol itself. It is customary and legally permissible for the manufacturer to store his product under bond to the government as security for the payment of the tax when and as it is released for use or distribution. Alcohol so held is said to be "in-bond." In-bond alcohol may be transported to other localities under government regulation without the prepayment of the tax and without being released from bond.

It is seen that alcohol, after tax paid, is much more valuable than alcohol, tax unpaid, and one of the important elements of a freight rate is the value of the thing shipped. United States v. Bornn, 2 Cir., 104 F.2d 641. This is so because of the greater care, responsibility and liability entailed in handling the more valuable thing.

No tax is paid upon alcohol which is released from a bonded warehouse to the government, and the quantity released is freed from the bond. Upon this premise, the shipper claims that the "in-bond" designation of the schedule comprehends all alcohol shipped tax unpaid, whether it is in-bond or freed from bond.

The shipper presented a traffic expert at the trial who testified that, in his opinion, the item providing for the lower (in-bond) rate was the applicable one. While he was on the witness stand, government counsel sought to introduce several tariff schedules not applicable to the shipments in question which contained items designated as "alcohol in bond (free of internal revenue tax) * * *."[2] The schedules so offered, it was claimed, tended to prove that the in-bond item in freight schedules was generally understood to encompass all shipments of alcohol which had not taken on the extra value of the tax.

The court understood the exhibits were being offered as "substantive" evidence and declined to receive them as such, but stated: "He [the witness] can say that the reason he bases his opinion (that all shipments, tax unpaid, come under the lower rate) is because he has examined the tariffs of other lines and that they did adopt that procedure." Whereupon, the witness made a rather lengthy non-responsive statement ending as follows: "Therefore, it seems to

---

[1] The Defense Supplies Corporation, the original plaintiff, was created by the Reconstruction Finance Corporation Act, § 5(d) (3), as amended, 55 Stat. 249, 15 U.S.C.A. § 603b (3). Its stock is owned by the RFC, which stock in turn is owned by the United States government. Defense Supplies Corporation was formed "to procure, acquire, carry, sell, or otherwise deal in strategic and critical material as defined by the President." By Act of Congress, July 1, 1945 (Public Law 109, 79th Congress, Ch. 215, 1st Session, 15 U.S.C.A. § 601 note), all functions, powers, duties, assets and liabilities of Defense Supplies Corporation were transferred to RFC.

[2] One of these schedules included the Illinois Central, a connecting line which handled at least some of the alcohol in suit. The other schedules were of railways which had no connection with this case. This difference in the schedules was not alluded to in the consideration of their admissibility.

me, it necessarily follows logically that they [the shippers] should not be called upon to pay 60 cents a gallon, a rate based on carrier's responsibility of 60 cents a gallon plus the tax." Thus the witness, instead of proceeding along the line of the court's suggestion, rationalized the applicable facts which he thought a proper basis for the application of a certain rate, into the conclusion that such rate therefore was the legal one. This was fair argument to the rate maker, but the district court is not the rate-maker.[3]

▮ No further attempt was made to have the proffered exhibits received in evidence, nor were they used in any manner as showing custom. It is probably true that the general acceptance of the meaning of an expression in the tariff schedule for a considerable period of time, although not within its face meaning, would establish it as its "term of art" meaning. It is seen that the court was careful to leave the way open for the proper use of the proffered schedules, merely ruling them out as "substantive" evidence. Of course, the fact that some railways explained "in-bond" shipments of alcohol as those upon which the tax had not been paid would not be competent direct evidence to prove that the shipments in suit should take the rate itemized as "in-bond." If the witness had followed the court's suggestion and the examining attorney's question consistent therewith, it may be that some evidence of general usage as to the significance of the term would have resulted. As it was, there was but a hint in the evidence that the schedule designation "in-bond" carries any meaning in addition to its common and plain face meaning. We hold that the Court was not in error in refusing to receive the proffered rate schedules as substantive evidence in the case.

The carrier, in his turn, presented a traffic expert who testified that the proper rate was the N.O.S. rate, or the higher of the two under consideration.

▮ Thus the evidence shows without contradiction that the tariff schedule covers the subject of alcohol under different classifications; that there is no classification "Tax Free"; and that the shipments could not fall under any classification other than Items 1497 and 1563. That is, unless there is evidence sufficient to require a finding that Item 1563 (in-bond) covers all shipments upon which the alcohol tax has not been paid, and also all alcohol upon which no tax is required to be paid, the Court did not commit error in finding that the omnibus, or N.O.S., Item No. 1497 is the applicable one. We hold that the evidence in the case did not require the Court to so find.

We note the citation by appellant of several cases in which the trial courts have received evidence which goes to the history and fundamental reason upon which freight classifications are based, and appellant's brief contains the following significant sentence: "It is the duty of the Court in construing a tariff to consider the end in view, and the object to be obtained by its framers *when this can be done consistently with the words used.*" (Emphasis ours.)

Such a case is Chesapeake & Ohio Ry. Co. v. U. S., D.C., 1 F.Supp. 350, wherein the Court considered the history and common meaning of the items "Household Goods" and "Emigrant Moveables." In Pennsylvania Ry. Co. v. U. S., 42 F.2d 600, 601, 70 Ct.Cl. 276, the Court held that, where the shipment was billed "crepe paper bandages for surgical dressing" and there was no tariff so classified by name, the shipment could be given the classification of

---

[3] "Under the statute there are many acts of the carrier which are lawful or unlawful according as they are reasonable or unreasonable, just or unjust. The determination of such issues involves a comparison of rate with service, and calls for an exercise of the discretion of the administrative and rate-regulating body. For the reasonableness of rates, and the permissible discrimination based upon difference in conditions, are not matters of law. So far as the determination depends upon facts, no jurisdiction to pass upon the administrative questions involved has been conferred upon the courts. That power has been vested in a single body, so as to secure uniformity and to prevent the varying and sometimes conflicting results that would flow from the different views of the same facts that might be taken by different tribunals." Pennsylvania R. Co. v. International Coal Min. Co., 230 U.S. 184, 185, 196, 33 S.Ct. 893, 895, 57 L.Ed. 1446, Ann.Cas.1915A, 315.

"surgical bandages * * *" or "paper crepe * * *" (the rates for these two classifications were the same), and should not be classified under "Paper N.O.I.B.N. * * *."

In the case of Macon D. & S. Ry. Co. v. General Reduction Co., 5 Cir., 44 F.2d 499, certiorari denied 283 U.S. 821, 51 S.Ct. 345, 75 L.Ed. 1436, it was held that the trial court could determine whether a certain shipment was fuller's earth or clay, the two having different classifications. The jurisdictional distinction between the I. C. C. and the federal district court is understandingly treated in the opinion, and therein also the leading case, Texas & Pacific Railroad Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255, is compared with the case under consideration.

In the tie case, there was no tariff schedule specifically for railroad cross-ties, but there was one for "lumber." Railroad and timber men differed as to whether railroad cross-ties were included in the term "lumber" and should take the shipping rate specified for lumber. The Court held the question within the rate making powers of the commission, which the courts ought not to attempt to decide. See also American Ry. Exp. Co. v. Price Bros., 5 Cir., 54 F.2d 67, wherein it was held that it was a question for the district court as to whether a shipment of small onions for planting came under the rate specified as "Green Onions" or "Plants, Strawberry and Vegetable." Crancer v. Lowden, 315 U.S. 631, 62 S.Ct. 763, 86 L.Ed. 1077.

All of these cases, with the possible exception of the tie case, are in accord with appellant's statement that evidence can be received to indicate the proper classification of a shipment "when this can be done consistently with the words used."

It is clear that the term "in-bond" cannot be tortured into also meaning exactly opposite its face meaning through the application of the principle applied in the cited cases. Only through general practice, custom, or, as the trial court preferred to say, through its becoming a "term of art" could this opposite meaning be attributed to it.

Whether an adjustment or reparation can be made, should the I. C. C. upon appropri-

ate proceeding hold the in-bond rate applicable, we, of course, do not decide. See Pennsylvania R. Co. v. International Coal Min. Co., 230 U.S. 184, at page 197, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas.1915A, 315, which case is cited upon the same point in Crancer v. Lowden, 315 U.S. 631, at page 636, 62 S.Ct. 763, 86 L.Ed. 1077.

Affirmed.