**DRAPER & CO., Inc. v. COMMODITY CREDIT CORP.**

**Civ. A. No. 51–1038.**

United States District Court
D. Massachusetts.

July 7, 1953.

Claude B. Cross, Withington, Cross, Park & McCann, Boston, Mass., for plaintiff.

George F. Garrity, U. S. Atty., and Harold G. Jackson, Asst. U. S. Atty., Boston, Mass., for defendant.

FORD, District Judge.

Draper & Company, Inc., a corporation engaged in the buying and selling of wool and the plaintiff herein, has brought suit for $75,000 based on alleged failure of the defendant Commodity Credit Corporation to accept delivery of wool tendered in September, 1951, under contracts entered into in December, 1950.

The defendant Commodity Credit Corporation, an agency of the United States within the Department of Agriculture, 15 U.S.C.A. § 714, contends that the wool tendered by the plaintiff for delivery to the defendant in September, 1951, was not eligible for sale to the defendant under contracts entered into in December, 1950.

Defendant also counterclaims for $6,250.-08 as liquidated damages under the contracts for plaintiff's alleged failure to deliver acceptable wool.

The facts stipulated by the parties for the most part are as follows:

### Findings of Fact.

1. Plaintiff, Draper & Company, Inc., is a corporation organized under the laws of the Commonwealth of Massachusetts engaged in the buying and selling of domestic and foreign wools.

2. Defendant, Commodity Credit Corporation, is a federal corporation created by the Commodity Credit Corporation Charter Act, 62 Stat. 1070, 15 U.S.C.A. § 714.

3. On September 27, 1950, Congress enacted the Supplemental Appropriations Act of 1951, P.L. 843, 81st Congress, 64 Stat. 1044, which provided in Chapter X, subtitle "Quartermaster Corps", in pertinent part as follows:

"* * * contracts may be made for the purchase of 100,000,000 pounds of raw wool, woolen garments, fabrics, and knitting yarns for use of all the armed services".

4. Pursuant to P.L. 843, the Quartermaster General, Department of the Army, on December 5, 1950, entered into a Wool Purchase Contract with the defendant, Commodity Credit Corporation, authorizing said defendant to acquire and sell to the Quartermaster General 30,000,000 pounds (minus the tolerance of 5%) clean basis of wool produced outside the United States. Said contract further provided that delivery to Commodity Credit Corporation under its purchase contract would be in bond without payment of customs duties.

5. In accordance with its contract with the Quartermaster General, the defendant on or about December 6, 1950 issued Public Announcement LS-262 stating its intention to purchase about 30,000,000 pounds of wool and setting forth the terms and conditions upon which offers to sell could be made.

6. Announcement LS-262 contained the following provisions:

"The Commodity Credit Corporation hereby announces its intention to purchase wool in a quantity of approximately 30,000,000 pounds clean basis. Wool offered for sale to the Commodity Credit Corporation under this announcement must meet the specifications as set out in schedule A attached hereto, as provided in paragraph 3 hereof, and must not have had United States Customs' duties paid thereon. Such wool is to be offered for sale to Commodity Credit Corporation on or before June 30, 1951. Commodity Credit Corporation reserves the right to reject any or all offers and to increase or decrease the quantity of wool with respect to which it invites offers of sale. Such wool will be purchased subject to the following terms and conditions:

"2. *Eligible Wool.* Wool eligible for sale to Commodity Credit Corporation shall be wool offered to Commodity Credit Corporation for delivery in bond in the warehouse in the continental United States designated by the vendor in the offer of sale. However, unless otherwise announced, only wool offered for delivery in store at the Boston Army Base, Boston, Massachusetts, will be considered. * * *

"3. *Specifications.* Only the types and grades of wool shown in Schedule A attached hereto will be considered for acceptance under this announcement."

Schedule A attached to the announcement listed by numbered items the types and grades of wool which the defendant considered purchasing. Item 234 was described as follows:

"Buenos Aires 5–S (40-s) Super Fleeces, fully skirted, Practically free 5 1/"–8"."

7. The terms and conditions of the announcement were specifically made part of the contracts entered into by the plaintiff and the defendant and were arrived at after consultation and upon the recommendations of representatives of the wool trade including the president of the plaintiff corporation.

8. On December 18, 1950, the plaintiff submitted to defendant a telegraphic offer reading as follows (Ex. 5):

"Undersigned offers to CCC, Subject to Terms and Conditions of Announcement LS–262.
Ninety Eight Thousand
Greasy Pounds of Wool Item 234
At One Dollar Eighty Seven Cents Per Pound Clean
Basis, in Bond, To be delivered in Boston Army Base, Boston, Not Later Than March fifteenth, 1951
Estimated Total Value One Hundred Eighteen Thousand Dollars."

On the same day, the plaintiff submitted to defendant a telegraphic offer for an additional 98,000 pounds of wool. This offer was in the same form as the first telegram except that the price was $1.88 per pound (Ex. 6).

9. On December 20, 1950, the defendant accepted the plaintiff's two telegraphic offers of December 18, 1950 by a reply telegram reading as follows (Ex. 7):

"Subject terms and conditions announcement LS–262 CCC hereby accepts your offer dated December 18, 1950 for item 234, 98,000 pounds at $1.87; 234, 98,000 pounds at $1.88; contract No. A1PM(FF)–27042."

10. On December 26, 1950, plaintiff submitted a similar telegraphic offer to defendant for 196,000 pounds of wool item 234 at $1.88 per pound (Ex. 12). On December 27, 1950, the defendant accepted this offer by a telegram identical with that of December 20, 1950, and assigned the contract No. A1PM(FF)–27058 (Ex. 13).

11. The announcement LS–262, the above telegraphic offers to sell by the plaintiff, the confirmations of the offers (Exs. 8 and 14), and the acceptances of the defendant constituted the contracts between the parties; and were unmodified except for the extensions of delivery date hereinafter mentioned.

12. Each contract provided that it would be satisfied by delivery of the contract

quantity within a plus or minus tolerance of 10% in pounds. Each contract further provided for liquidated damages upon plaintiff's failure to deliver wool at the rate of 5% of the contract sales price.

13. On January 2, 1951, The Bureau of Customs, at the request of the Quartermaster General, designated the Boston Army Base a Customs Bonded Warehouse, Class 2, for the purposes of the wool purchase program.

14. At the request of the plaintiff, the contracts were amended, extending the delivery date to April 30, 1951.

15. The plaintiff bought wool in Argentina, imported it into the United States, and tendered physical delivery of the same to the defendant at the Boston Army Base in April of 1951. The duties on this wool had not been paid, and the wool was entered for warehouse under plaintiff's General Term Bond (Exs. 26, 28).

The defendant accepted only one hundred bales, or about 98,000 pounds, under the contract made on December 20, 1950, and rejected the balance as not in conformity with the description of item 234.

16. In May, 1951, the plaintiff sold 126 of the rejected bales to Bigelow-Sanford Carpet Company. These bales were withdrawn from warehouse conditionally free of duty under par. 1101, Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 1101, and responsibility for any duties was transferred to Bigelow-Sanford under its bond (Exs. 32, 55, 56).

17. In June, 1951, plaintiff wrote the defendant asking that the delivery dates on the remaining two contracts be extended in order that the wool previously rejected could be replaced by the plaintiff. The defendant agreed to and extended the time for performance under the contracts to September 30, 1951.

18. The plaintiff purchased from the Bigelow-Sanford Carpet Company approximately 178 bales of Item 234, which were in a customs bonded warehouse and under the custody of the United States Customs Bureau. This wool, approximately 169,414 pounds in the grease, tendered for delivery by plaintiff in July was accepted by the defendant in part performance of the contract of December 27, 1950, thus leaving a balance of approximately 126,586 pounds to be delivered in completion of the contracts.

19. The plaintiff also repurchased the 126 bales of wool, previously rejected by the defendant, from Bigelow plus twenty-three other bales which plaintiff had imported from Argentina in April, 1951, and had sold to Bigelow for carpet manufacture. The additional twenty-three bales had been entered conditionally free of duty under bond (Exs. 31, 33).

20. The plaintiff then proceeded to regrade the 149 bales of wool so repurchased from Bigelow together with five other bales of wool which plaintiff had imported and entered for warehouse in February and April, 1951 (Ex. 62).

21. As a result of the regrading, the plaintiff obtained 261 bales of wool of which it set aside 237 bales for tender to the defendant under its contracts. These 237 bales had a net weight of 124,727 pounds.

22. On September 7, 1951, the plaintiff tendered delivery of the 237 bales of regraded wool to the defendant at the Boston Army Base, but the defendant refused to accept them.

23. On September 7, 1951, the duties on the 237 bales had not been paid but the plaintiff was contingently liable therefor under its General Term Bond.

24. The 237 bales were fully up to the physical specifications of the contracts, and an inspection certificate so stating was signed but not issued to the plaintiff. The sole reason given by defendant for its refusal to accept the wool was that defendant considered the wool as ineligible under the contract since it had been regraded from wool which had been given a conditional free entry under a "carpet bond" and hence was regarded by defendant as not being wool "in bond" within the terms of the contract.

25. The parties held several conferences to determine whether the defendant would accept delivery of the wool or continue to refuse to do so. In the course of these

conferences, the plaintiff offered to pay any customs duties that might be assessed by reason of the fact that the wool which had been regraded had been given conditionally free entry under par. 1101, Tariff Act of 1930.

26. Wool entered for warehouse and stored in a bonded warehouse may be and is sold and resold in the trade without removal from the warehouse, deliveries being effected by transfer of warehouse receipts.

27. All deliveries made by plaintiff to defendant at the Boston Army Base were physical deliveries, not deliveries by warehouse receipts.

28. The market value of wool of the type and grade specified in the contracts was $1 a pound on a clean basis on September 30, 1951 and on October 15, 1951.

29. The plaintiff, in February 1952, resold the 237 bales tendered for apparel purposes and reported its liability for duty of 13 cents a pound.

Fifty-one of the bales were sold for $18,536.70 at 70 cents a pound in the grease and 186 bales for $66,728.40 at 68 cents a pound in the grease, or in each case at about $1 a pound on a clean basis. These sales were made subject to duty. The invoices (Exs. 67, 68) describe the sales as "in bond".

30. The contract price of the 237 bales at $1.88 a pound on a clean basis was $164,140.73.

## Discussion

The sole question on which the parties are at issue is whether the wool offered by plaintiff and rejected by defendant on September 7, 1951 was wool "in bond" under the terms of the contract between the parties. The contract incorporated the provisions of Announcement LS–262 which included the condition that "Wool eligible for sale to Commodity Credit Corporation shall be wool offered to Commodity Credit Corporation for delivery in bond ·* * *." The telegraphic offer of plaintiff similarly described the wool offered as wool "in bond". The only other pertinent phrase in the contract documents is the requirement of Announcement LS–262 that the wool offered "must not have had United States Customs' duties paid thereon."

It is the contention of the defendant that by wool "in bond" is meant wool held for delivery in a Bureau of Customs bonded warehouse, and thus held in government custody, and that with the withdrawal of the wool in question from such warehouse and custody and its delivery to a manufacturer for use in carpet making, it ceased to be wool "in bond", even though it was admitted conditionally free of duty and was withdrawn under a so-called "carpet bond". Plaintiff argues, on the other hand, that when the wool was withdrawn from the warehouse it was covered by the carpet manufacturer's bond given under par. 1101 of the Tariff Act of 1930 and hence the transfer did not remove it from the category of wool "in bond".

The words "in bond" taken in their ordinary meaning would seem to be equally applicable to wool stored in a bonded warehouse, and wool covered by a bond given under par. 1101 by one who withdraws the wool for use in carpet manufacture. In either case the essential feature of the situation .seems to be that the government is protected by a bond given as security for the payment of customs duties which may eventually be found to be due on the wool.

Nothing in the language used in the customs statutes and regulations requires a different interpretation. The regulations governing conditional free entry of wool under par. 1101, as set forth in 19 C.F.R. §§ 10.91 through 10.97, do not use the expression "in bond" but refer to such wool as "bonded wool" or as wool "under bond". Such wool, however, has been described as wool "in bond" in Treasury Decisions. Thus TD 46515(9), 64 Treasury Decisions p. 38, speaks of "wool imported or withdrawn from warehouse in bond under paragraph 1101 of the Tariff Act of 1930, * * *." In U. S. Treasury Department, Digest of Customs and Related Laws and Decisions Thereunder, 1935, Vol. 1, pp. 586, 587, such wool is spoken of as being "imported in bond."

The expression "in bond" as used in the statutes and regulations is not synonymous with "in customs custody" or "in a bonded warehouse". Thus goods are spoken of in the regulations as being "transported in bond" when they are being transported under the coverage of a carrier's bond, even when they may actually be transported by the facilities of a non-bonded carrier, 19 C.F.R. § 18.1, and goods are said to be transported in bond even when being carried through contiguous countries, 19 U.S. C.A. § 1554. Moreover, the statutes distinguish between merchandise "in bond" and merchandise in the custody and control of customs officers. 19 U.S.C.A. § 1563, and former § 1598 repealed June 25, 1948, c. 645, § 21, 62 Stat. 862.

Just as wool may be entered conditionally free of duty for use in carpet manufacture, so imported salt may likewise be entered for use in curing fish. The applicable regulations refer to this salt as being "under bond", 19 C.F.R. § 10.80 (the same phrase used in 19 C.F.R. § 10.91 in reference to wool for carpets), while the statute speaks of this salt as "in bond", 19 U.S.C.A. § 1313(e). Defendant cites Reconstruction Finance Corporation v. Spokane, P. & S. Ry. Co., 9 Cir., 170 F.2d 96, as holding that alcohol withdrawn tax unpaid from a bonded warehouse was no longer in bond. But there the alcohol had been withdrawn tax free by the government as owner, and unlike the wool in this case was no longer covered by any kind of bond as security for payment of taxes.

The parties are in dispute as to whether the action of the Bureau of Customs in designating, on January 2, 1951, the Boston Army Base as a Customs Bonded Warehouse, Class 2, is valid in the light of the prohibition of 19 U.S.C.A. § 1560. It is not necessary to pass on this question, however, since it took place after the contracts had been formed by the defendant's acceptance of plaintiff's offers to sell wool. At the time of the offers the Army Base was not a bonded warehouse and there is no evidence to show that plaintiff knew that there was any plan to designate it as such. These facts do not justify any

conclusion that plaintiff in offering goods for delivery to the Army Base thought that this was delivery to a bonded warehouse, and hence by its offer of delivery in bond meant delivery to such a warehouse. If any conclusion as to the meaning of the words of the contract is to be drawn from the status of the Army Base, it must be drawn from that status as known to the parties when the contract was made. The situation then existing favors the conclusion that delivery in bond was not intended to require that the wool delivered be in a bonded warehouse or under customs custody.

Defendant also puts forward an argument based on the intent of Congress in authorizing the wool purchase program of which the contracts in controversy formed a part. Neither the statute authorizing the program, Supplemental Appropriations Act of 1951 (Public Law 843, 81st Congress, 64 Stat. 1044), nor the committee reports referring to it contain any statement of the purpose of the legislation. Statements of the Senators who were proponents of the program indicate that their object was to provide for the stockpiling of wool obtained from foreign sources, both to overcome existing shortages of wool for military purposes and to prevent other nations from buying up all available foreign wool. In line with this, the contract between the Quartermaster General and the defendant provided for the purchase of wool produced outside the United States.

Defendant argues that the provision that the wool to be delivered should be wool in bond on which customs duties had not been paid was placed in the contract for the purpose of carrying out this objective by insuring that no wool purchased should be wool which was withdrawn from the domestic commerce of the United States. Plaintiff contends that the purpose of the provision was to insure that the price to be paid for the wool by defendant should not include customs duties paid by the importer.

Plaintiff's view appears to be the preferable one. The important characteristic of wool in bond would seem to be the fact

that no duty has yet been paid on it, since the reason for requiring a bond is to secure the government against non-payment of the duty eventually found to be payable. Hence, the requirement that wool be in bond would seem to be primarily directed to insuring that it be wool on which no duty had been paid. The first appearance of the requirement that the wool should be in bond is in the contract between defendant and the Quartermaster General, and there the in bond requirement is followed by the explanatory words "without payment of customs duties" and is separated from the earlier sentence requiring that the wool purchased should have been produced outside the United States. Moreover, the bonding requirement was not one particularly well adapted to insuring that the wool acquired should all be foreign wool imported in addition to existing domestic commercial requirements. Wool held in bond in a bonded warehouse is regularly bought and sold in our domestic wool market by means of warehouse receipts, being withdrawn and the duty paid only when it comes into the hands of a buyer who wishes to make immediate use of it. As a practical matter much of the wool thus stored in bonded warehouses is a part of our domestic wool supply. Yet this wool, which might have been imported long before the inauguration of the wool purchase program and which might have been bought and sold many times, would nevertheless be eligible wool, since it is clearly bonded wool on which no duty has been paid.

Under plaintiff's view of the purpose of the in bond requirement, this wool involved here was clearly eligible. No duty had been paid on it at the time it was offered to defendant. Up to now, no duty has ever been paid on it. In case any duty should ever have to be paid, plaintiff is still willing to pay it without in any way increasing the cost of the wool to the defendant. But even if it be assumed that defendant's view of the purpose of the requirement is the correct one, it is difficult to see how acceptance by defendant of the wool in question would have in any way defeated the program. This wool is for the most part regraded from wool which was specifically purchased abroad and imported by plaintiff for the purpose of supplying wool to defendant under its purchasing program. It is wool which except for that program might never have been imported. While it may have been temporarily diverted to a proposed domestic use while plaintiff was not aware that it could be regraded, plaintiff promptly recovered it, regraded it, and offered it to the defendant. It was exactly the type of wool which defendant's purchasing program was intended to bring in and should have been accepted. The only conceivable reason it was not accepted was, as suggested by the plaintiff, the drop in the market price of wool in 1951. This circumstance evidently gave seed to the belief that the defense here interposed by the defendant was sufficient. It would appear from what has already been said that the defense is without substance.

## Conclusions of Law.

1. Plaintiff fully complied with the requirements of the contract.

2. The wool which plaintiff tendered for delivery at the Boston Army Base on September 7, 1951 was in bond within the meaning of the contracts.

3. Defendant was not legally justified in refusing to accept delivery of this wool, and this refusal constituted a breach of the contracts by the defendant.

4. Plaintiff is entitled to recover as damages the difference between the contract price and the market price of the wool on September 30, 1951, when the time for delivery expired, with interest from September 30, 1951.

Judgment on the complaint for plaintiff in accordance herewith; defendant's counterclaim dismissed.