**CATERPILLAR TRACTOR CO.,**
Plaintiff,

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,**
Defendant.

Civ. A. No. P–3239.

United States District Court,
S. D. Illinois, N. D.

Nov. 24, 1971.

Paul M. Daniell, Atlanta, Ga., Homer W. Keller, Peoria, Ill., for plaintiff.

William J. Voelker, Jr., Peoria, Ill., for defendant.

### DECISION AND ORDER

ROBERT D. MORGAN, District Judge.

In this suit plaintiff, Caterpillar Tractor Co., a California corporation, having its principal place of business in Peoria, Illinois, seeks a refund of $100,959.32, plus interest, from payments made to defendant, The Atchison, Topeka and

Santa Fe Railway Company, for shipments of tractors and tractor parts shipped via defendant's line. The sole issue in dispute is whether the shipments, which were bound for construction projects in South Viet Nam, were subject to domestic or export tariff rates. This issue of law has been submitted to the court for decision on the pleadings, stipulations of fact, and written briefs of the parties. The court has jurisdiction under 28 U.S.C. § 1337 and 49 U.S.C. § 9.

All relevant facts have been stipulated; they are as follows. From October 4, 1965 through June 16, 1966 plaintiff shipped via defendant 109 shipments of tractors and related materials to one RMK-BRJ, a joint adventurer engaged in construction activity in South Viet Nam under contract with the United States Government. Plaintiff, defendant, and RMK-BRJ understood at all times that the shipments were for export to South Viet Nam, and all treated the shipments accordingly. The bills of lading for the shipments bore the legend "For Export to Viet Nam," or other words of similar import. All shipments were consigned to the purchaser in care of either the Naval Supply Center, Oakland, California, or the Naval Construction Battalion Center, Port Hueneme, California. Both naval facilities contain piers, warehouses and rail trackage on which no commercial rail carriers are permitted to operate. As is customary, defendant left the cars carrying the 109 shipments involved here on the tracks immediately outside the naval facilities. It is not disputed that this constituted delivery to the consignee and marked the end of the defendant's responsibility for the shipments, which were then transported by ocean vessel to South Viet Nam.

Defendant initially assessed plaintiff freight charges based on export rates under defendant's Transcontinental Freight Bureau Tariff 29–M, which charges were paid. Defendant subsequently charged, and plaintiff paid, the difference between the lower export rates and the higher domestic rates, said difference being the amount in controversy here. Plaintiff then filed an "informal complaint" with the Interstate Commerce Commission (ICC), arguing that the export rates were applicable. On September 21, 1970, the ICC issued an "informal ruling" (No. 210543) upholding plaintiff's argument. This informal ruling, however, is not a final adjudication by the ICC and is in no way binding on the parties. After plaintiff's demand for refund was then refused by defendant, this suit was filed.

As previously stated, the sole issue between the parties is whether plaintiff should have been charged the export rates instead of the higher domestic rates on the 109 shipments. This is an issue of law requiring construction and interpretation of Tariff 29–M. The tariff has the same force and effect as a statute. Pennsylvania R. R. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913).

The controlling portions of Tariff 29–M are:

"1130 RESPONSIBILITY FOR FREIGHT AT PACIFIC COAST PORTS

Rates and provisions as stated in this tariff apply only to freight which (except as specifically provided for in individual items in this tariff * * *) does not leave the possession of the rail carriers until delivered to common carriers by water at Pacific Coast Ports of interchange with such common carriers by water, and rail carriers' responsibility shall cease upon such delivery."

"1170 TRAFFIC DESTINED BEYOND PACIFIC COAST PORTS

(a) Rates authorized apply only to export traffic when destination beyond Pacific Coast port of export is shown in bill of lading or shipping receipt, and the freight is not diverted while in possession of rail carriers to another destination, nor held at port of export or enroute thereto on request of shipper, owner or other party interested * * *."

Plaintiff's first argument is that the caption of Item 1130 clearly indicates that the item is concerned only with the rail carriers' responsibility, and that the item in no way limits application of the export rates. Moreover, plaintiff argues that the parenthetical exception in Item 1130 refers to, among others, Item 1170, the terms of which, it argues, clearly make the export rates applicable to these shipments. Plaintiff further argues, on the strength of Chicago, Rock Island & Pacific R. R. v. Furniture Forwarders, Inc., 267 F.Supp. 175 (E.D.Mo.1967), that Item 1130 is by itself ambiguous when applied in this situation, and that any ambiguity must be construed against the carrier.

On the other hand, defendant contends that Item 1130 is unambiguous and precludes application of the export rates to these shipments because the shipments left defendant's possession before being delivered to common carriers by water at Pacific Coast ports. That is, the shipments were delivered to the Government facilities in California, not to common carriers by water.

In support of its position, defendant cites a number of federal court and ICC decisions. Although the cases are distinguishable on the facts, the court believes that the following passage cited by defendant does accurately state the general rule governing construction of tariffs:

"The construction of a printed railroad tariff presents a question of law and does not differ in character from that presented when the construction of any other document is in dispute. The four corners of the instrument must be visualized and all the pertinent provisions considered together, giving effect so far as possible to every word, clause, and sentence therein contained. The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed, and any ambiguity or reasonable doubt as to their meaning must be resolved against the carriers. But claimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in the light of the ordinary meaning of the words used and not a mere arguable basis." United States v. Missouri-Kansas-Texas R. R., 194 F.2d 777, 778–779 (5th Cir. 1952) (followed in Chicago, Burlington & Quincy R. R. v. United States, 221 F. 2d 811 (7th Cir. 1955)).

However, as stated by the United States Court of Appeals for the Seventh Circuit in a later case:

"Another rule of construction is that a tariff should be interpreted to avoid unjust, absurd, or improbable results. * * * If a tariff is subject to different constructions, an interpretation which is reasonable and consistent with the purposes of the tariff should be preferred to a construction which is impractical or which leads to absurd consequences." National Van Lines, Inc. v. United States, 355 F.2d 326, 332 (7th Cir. 1966) (citations omitted).

In the view of this court, Items 1130 and 1170 of Tariff 29–M, when applied in this fact situation, do create a substantial ambiguity, since Item 1130 appears to exclude from coverage that which Item 1170 appears to include. This ambiguity is amplified by the vague exception included in the language of Item 1130. (Compare Chicago, Rock Island & Pacific R. R. v. Furniture Forwarders, Inc., 267 F.Supp. 175 (E.D. Mo.1967), in which it was held that Item 1130 by itself was sufficiently ambiguous to allow application of the export rates.) This substantial ambiguity must be resolved against the rail carrier.

In this case, construing the ambiguity against the carrier also has the salutary effect of avoiding an unjust and improbable result; for if defendant's position were upheld, all exports travelling through Government depots would be charged a much higher rate than other exports without any substantial difference in rail carrier service.

The soundness of this decision is further illustrated by a recent amendment to Tariff 29–M, which expressly qualified exports through government depots for the lower export rates. (Supp. 43 to Tariff 29–M.) It is, of course, true that the amendment does not retroactively create an ambiguity in the original tariff that did not exist before the amendment. The amendment does, however, shed light on what is a just result and what is consistent with the purposes of the tariff, within the meaning of the *National Van Lines* case quoted above. Consequently, the court holds that the export rates of Tariff 29–M are applicable to the 109 shipments in question.